[No. S029708. Dec. 30, 1993.]

CHARLES HUNTER, Plaintiff and Respondent, v.
UP-RIGHT, INC., Defendant and Appellant.

1176

## Counsel

Baker, Manock & Jensen, Andrew R. Weiss, Catherine E. Basham, Wunsch & George and Armen L. George for Defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Paul Grossman, Paul Cane, Gibson, Dunn & Crutcher, David A. Cathcart, Kathrin Sears and Mark Snyderman as Amici Curiae on behalf of Defendant and Appellant.

Bennett & Sharpe and Nicholas John Paul Wagner for Plaintiff and Respondent.

Joseph Posner, Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

**PANELLI, J.**—We granted review in this case to determine whether *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*) precludes recovery of tort damages for fraud and deceit predicated on a misrepresentation made to effect termination of employment. *Foley* made clear that the employment relationship is "fundamentally contractual," and that—terminations in violation of public policy aside—contract damages are the appropriate remedy for wrongful termination. (*Foley*, *supra*, 47 Cal.3d at pp. 665, 696, 699.) We have continuously adhered to that view. (E.g., *Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1086, fn. 1 [4 Cal.Rptr.2d 874, 824 P.2d 680]; *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 24 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720]; *Screen Extras Guild, Inc.* v. *Superior Court* (1990) 51 Cal.3d 1017, 1027 [275 Cal.Rptr. 395, 800 P.2d 873]; *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059].) Analyzing the circumstances of this case in light of *Foley* and of the traditional elements of fraud, we conclude that wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if some misrepresentation is made in the course of the employee's dismissal. Tort recovery is available only if the plaintiff can establish all of the elements of fraud with respect to a misrepresentation that is separate from the termination of the employment contract, i.e., when the plaintiff's fraud damages cannot be said to result from termination itself. The record in this case does not support such recovery. Accordingly, we reverse the judgment of the Court of Appeal.

## Factual Background

Charles Hunter began working as a welder for Up-Right, Inc. (Up-Right) in January 1973. In 1980 he was promoted to welding supervisor and worked in that capacity until his employment was terminated on September 10, 1987.

In August 1988 Hunter sued Up-Right and his former supervisor, Pat Nelson, alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and various torts. After this court filed its decision in *Foley, supra,* 47 Cal.3d 654, Hunter sought and obtained permission to amend his complaint to allege a cause of action for fraud, based on the same facts as alleged in the original complaint.

The evidence presented at trial was in conflict regarding the circumstances of Hunter's termination. Hunter testified that he enjoyed his job at Up-Right, got along well with coworkers, and received excellent performance evaluations. He testified that at the end of the workday on September 10, 1987, he was called in to meet with Nelson. According to Hunter, Nelson told him that there had been a corporate decision to eliminate his position and that if he did not resign he would be terminated. Hunter testified he asked Nelson for the opportunity to work in a lesser position within the company, but was refused. Hunter then signed a document setting forth his resignation. The next day he picked up his final paycheck, which included $5,200 in severance pay.

Nelson testified to a different series of events. On several occasions during a period prior to September 9, 1987, Nelson testified he had admonished Hunter regarding excessive absences to attend to personal matters. On September 9, 1987, Nelson testified, Hunter told him he was thinking of resigning due to personal problems. Nelson told him to think about it overnight and come back the next day. Nelson directed his secretary, Catherine Olson, to prepare a resignation form for Hunter's signature. On September 10, Hunter returned and told Nelson he had decided to resign. Hunter then signed the resignation form. Nelson had Olson prepare a final paycheck. Nelson testified that no corporate decision had been made to eliminate Hunter's job.

John Maricich, who had been plant superintendent for Up-Right for eight years until his resignation in January 1988, testified that Up-Right had a policy of terminating employees only for good cause. He testified that Hunter was an excellent employee.

Dr. Gerald Martin, a professor of finance in the School of Business at Fresno State University, testified as an economic expert witness that Hunter's past economic losses resulting from termination were $38,013 and that the present value of his future losses was $146,456.

The jury found in favor of Hunter on three theories: breach of implied contract not to terminate employment without good cause, breach of implied covenant of good faith and fair dealing, and fraud. By special verdict, it awarded Hunter $38,013 on the contractual theories and $120,000 for misrepresentation. The parties agreed that the $120,000 figure represented the jury's finding as to Hunter's total damages, and thus included the $38,013 awarded as contractual damages. The trial court entered judgment in favor of Hunter in the amount of $120,000, and the Court of Appeal affirmed.

## DISCUSSION

A discussion of the scope of remedies for wrongful termination appropriately begins with an analysis of relevant portions of our decision in *Foley*, *supra*, 47 Cal.3d 654. ■ In *Foley* we examined the nature of the employer-employee relationship, concluding it is fundamentally contractual. ■ We noted that "[t]he distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.' [Citation.]" (*Foley*, *supra*, 47 Cal.3d at p. 683.) ■ We reaffirmed the principle that an employee who is discharged in violation of public policy can recover tort damages, provided the policy is one affecting a duty that inures to the benefit of the public at large, rather than solely to the employer. (*Foley*, *supra*, 47 Cal.3d at pp. 665-671; see *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]; *Gantt* v. *Sentry Insurance*, *supra*, 1 Cal.4th 1083 [*Tameny* claim must be predicated on public policy expressed in statute or constitutional provision].) However, we declined the plaintiff's invitation to extend tort remedies for the essentially contractual claim of breach of the implied covenant of good faith and fair dealing. (*Foley*, *supra*, 47 Cal.3d at pp. 683-693.)

Our observations on this latter issue are significant for the present case. ■ We noted in *Foley* that remedies for breach of the covenant of good faith, which is implied in every contract and aims to make effective the agreement's promises, have almost always been limited to contract damages. (47 Cal.3d at p. 684.) An exception developed in the context of insurance contracts. In that setting, a variety of policy reasons have led courts to

conclude that breach of the implied covenant provides a basis for an action in tort. "The insured in [an insurance contract] does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity." (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691 [620 P.2d 141].) "As one commentary has noted, 'The insurers' obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements . . . .' " (*Id.* at p. 820.) Moreover, "the relationship of insurer and insured is inherently unbalanced: the adhesive nature of insurance contracts places the insurer in a superior bargaining position." (*Id.* at p. 820.)

In *Foley* we emphasized the distinctions between the insurance and employment contexts. In the insurer-insured relationship, the parties' interests are financially at odds: if the insurer pays a claim, it diminishes its own fiscal resources. By contrast, the interests of employer and employee are typically aligned: if there is a job to be done, the employer must pay someone to do it. A breach in the employment relation does not place the employee in the same economic dilemma that an insured faces when an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits. If an insurer takes such actions, the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred. A terminated employee, on the other hand, can (and must, in order to mitigate damages) make reasonable efforts to find alternative employment. In sum, we were not convinced that the employee necessarily seeks a different kind of financial security from a person entering into a typical commercial contract. (*Foley*, *supra*, 47 Cal.3d at pp. 692-693.)

 We next looked to the likely practical effect of an extension of tort remedies for breach of the implied covenant of good faith and fair dealing. We expressed concern that introducing tort remedies in employment termination would unduly deprive employers of discretion to dismiss employees by raising fears that any dismissal might lead to tort recovery. (*Foley*, *supra*, 47 Cal.3d at p. 696.) Further, we doubted whether a rule could be formulated that would assure that only "deserving" cases give rise to tort relief: virtually any termination could provide the basis for an allegation that the employee's discharge was in bad faith. (*Id.* at pp. 697, 699.) Finally, we emphasized that the expansion of tort remedies in the employment context carried potentially enormous consequences for the stability of the business community. (*Id.* at p. 699.)

Accordingly, in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and

existing protections against improper terminations, we declined to extend tort remedies for breach of the good faith covenant in a contract of employment. (*Foley*, *supra*, 47 Cal.3d at pp. 692-693.)

Decisions of the Court of Appeal in wrongful termination suits since *Foley* have adhered to *Foley*'s conception of the employment relation as fundamentally contractual, giving rise only to contractual damages in the event of breach in the absence of some violation of a fundamental public policy. In *Hine* v. *Dittrich* (1991) 228 Cal.App.3d 59 [278 Cal.Rptr. 330], Hine was terminated for insubordination when he refused to attend a company meeting, assertedly because Dittrich, a fellow employee who had been threatening him, was to be present at the meeting armed with a sawed-off shotgun. (*Id.* at p. 61.) Hine sued his former employer for negligently supervising Dittrich, alleging as damages that he suffered emotional distress after his termination. The Court of Appeal reasoned that because Hine suffered no injury independent of his termination, *Foley* precluded Hine's tort action. "Hine can no more turn a contractual wrongful discharge action into a negligent supervision tort claim than could a terminated employee plead negligence simply because the employer negligently failed to follow prescribed procedures before the firing[,]" the Court of Appeal concluded. (228 Cal.App.3d at p. 64; see also *Summers* v. *City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1058-1059 [275 Cal.Rptr. 594] [holding that after *Foley* an employee cannot recover tort damages for denial of due process in termination].)

The *Hine* court relied in part on *American Guar. & Liability* v. *Vista Medical Supply* (N.D.Cal. 1988) 699 F.Supp. 787, 791, which held that an employee's cause of action for negligent misrepresentation based on the employer's representation that she would have job security was part and parcel of the concurrent wrongful discharge claim because it arose out of the employer's intentional act of discharging her. Although *Vista Medical Supply* was an insurer's action seeking a declaration of its duty to defend the employer in the employee's wrongful termination suit, the court's conclusion is correct and pertinent to the present issue.

In *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390 [3 Cal.Rptr.2d 6], an employee brought a wrongful termination suit alleging, in addition to contractual and statutory claims, various tort causes of action. The Court of Appeal noted that, under *Foley*, damages for emotional distress are not recoverable in a wrongful discharge action. The same result logically followed, in the court's view, with regard to the employee's claims of intentional interference with contractual relations, defamation, negligence, prima facie tort, and conspiracy. Because the employee's tort claims were all

founded on the employer's conduct that formed the basis of the causes of action for wrongful constructive termination—i.e., evaluating the employee's performance and demoting her—the court concluded that summary judgment in the employer's favor on the tort claims was proper. (2 Cal.App.4th at p. 404.)

Of further concern in the shaping of remedies for wrongful termination has been the existence of the workers' compensation system, with its exclusive remedy provisions. (Lab. Code, §§ 3600 [workers' compensation as exclusive remedy against employer for any injury sustained by an employee arising out of and in the course of the employment], 3601 [workers' compensation as exclusive remedy for the injury or death of an employee against fellow employee, with specified exceptions].)　■　In *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743] (*Cole*), we reinforced the exclusivity barrier to tort recovery in the employment context, holding that allegations of intentional employer misconduct are not, by themselves, sufficient to permit a civil action outside the workers' compensation system. Consistently with *Cole*, we have held that disabling injuries, whether physical or mental, arising from termination of employment are generally within the coverage of workers' compensation and are subject to the exclusive remedy provisions, unless the termination falls within an express or implied statutory exception or results from risks outside the compensation bargain. (*Shoemaker* v. *Myers*, *supra*, 52 Cal.3d at p. 7.) Finally, we have recognized that when an employee suffers emotional upset on account of the employer's conduct but neither is disabled nor requires medical care, and when the employer's conduct neither contravenes public policy nor exceeds the inherent risks of the employment, the employee's injury results in no occupational impairment compensable under the workers' compensation system or remediable by a civil action. (*Livitsanos* v. *Superior Court* (1992) 2 Cal.4th 744, 755 [7 Cal.Rptr.2d 808, 828 P.2d 1195].)

The present case does not require us to revisit the scope of the workers' compensation system in the wrongful termination context; we expressly limited review to the question of *Foley*'s effect on a terminated employee's cause of action for fraud and deceit. Nonetheless, the *Cole-Shoemaker-Livitsanos* line of cases is instructive for its careful and consistent observance of legislated restrictions on civil tort recovery in the wrongful termination context when the employer's conduct falls within the compensation bargain. We have not allowed workers to avoid the otherwise applicable statutory compensation system, whether to deter tortious conduct by employers or for other reasons.　■　We are now asked, in somewhat analogous fashion, to determine whether the breach of what we have recognized as an

essentially contractual relation can, in light of *Foley*, support tort recovery for fraud and deceit—in order to deter fraudulent conduct by employers, as an amicus curiae urges, or to advance some other policy goal.

The Court of Appeal answered this question affirmatively, reasoning that different objectives underlie claims for fraud, on one hand, and breach of the implied covenant in an employment agreement, on the other. The Court of Appeal believed that enforcement of the implied covenant safeguards the parties' interest in having promises performed—a traditional goal of contract law—while the fraud cause of action protects a general societal interest apart from the private interests of the contracting parties. The Court of Appeal hazarded that the breach of an employment contract usually does not entail fraud or deceit, and that there is no reason to shield from liability an employer who, in addition to breaching an employment contract, also engages in conduct "outside the bounds of the contractual provisions."

The Court of Appeal erred in inferring that an employer that misrepresents a fact in the course of wrongfully terminating an employee has committed a fraud. The court contrasted Hunter's testimony (that Nelson told him his job had been eliminated by corporate decision) with Nelson's testimony (that no such corporate decision had been made and that Hunter would not have been dismissed had he not signed a resignation). From this, the court concluded that Hunter had proved a knowing misrepresentation (the supposed corporate decision) that was intended to defraud Hunter into resigning his job, Hunter's detrimental reliance (in resigning), and his resulting damage. Thus, according to the Court of Appeal, Hunter established each of the elements of fraud: (a) misrepresentation; (b) defendant's knowledge of the statement's falsity; (c) intent to defraud (i.e., to induce action in reliance on the misrepresentation); (d) justifiable reliance; and (e) resulting damage. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778; Civ. Code, § 1709; *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 422 [159 P.2d 958].)

The problem with the Court of Appeal's analysis is that the result of Up-Right's misrepresentation is indistinguishable from an ordinary constructive wrongful termination. The misrepresentation transformed what would otherwise have been a resignation into a constructive termination. As the jury found that Up-Right lacked good cause to dismiss Hunter, the constructive termination was wrongful. Thus, Up-Right simply employed a falsehood to do what it otherwise could have accomplished directly. It cannot be said that Hunter relied to his detriment on the misrepresentation in suffering constructive dismissal. Thus, the fraud claim here is without substance.

Moreover, it is difficult to conceive of a wrongful termination case in which a misrepresentation made by the employer to effect termination could

ever rise to the level of a separately actionable fraud. In essence, such misrepresentations are merely the means to the end desired by the employer, i.e., termination of employment. They cannot serve as a predicate for tort damages otherwise unavailable under *Foley*. If the termination itself is wrongful, either because it breaches the employment contract or because it violates some well-established public policy articulated in a statute or constitutional provision, then the employee is entitled to recover damages sounding in contract or tort, respectively. But no independent fraud claim arises from a misrepresentation aimed at termination of employment.

█ Recognition of a fraud cause of action in the context of wrongful termination of employment not only would contravene the logic of *Foley*, but also potentially would cause adverse consequences for industry in general. Fraud is easily pleaded, and in all likelihood it would be a rare wrongful termination complaint that omitted to do so. Much harder, however, is the defense of such claims and their resolution at the summary judgment or demurrer stage of litigation. The resultant costs and inhibition of employment decisionmaking are precisely the sort of consequences we cited in *Foley* in disapproving tort damages for breaches of the implied covenant of good faith and fair dealing.

We note, however, that a misrepresentation *not* aimed at effecting termination of employment, but instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination. The Court of Appeals for the Ninth Circuit addressed such a situation in *Miller* v. *Fairchild Industries, Inc.* (9th Cir. 1989) 885 F.2d 498, 509-510. In that case, the employees had filed complaints against Fairchild with the Equal Employment Opportunity Commission, which resulted in negotiation of settlement agreements by which the employees gave up their right to sue under title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e-3(a)) in return for Fairchild's promise to provide training opportunities. Soon after the settlement, however, the employees were laid off. They sued Fairchild, alleging, as one of their causes of action, that Fairchild fraudulently induced them to enter into the settlement agreements by concealing the fact that they were probable candidates for future layoff, and by making promises that Fairchild had no intention of keeping. The court concluded that Fairchild's failure to provide the promised training opportunities supported an inference that it had not intended to perform when it signed the settlement agreements. (885 F.2d at p. 509.) Thus, the trial court's entry of directed verdict on the fraud causes of action was improper. (*Id.* at p. 510.)

In *Miller* v. *Fairchild Industries, Inc.*, *supra*, the allegedly fraudulent settlement agreement was collateral to the employment contract itself. The

*Miller* plaintiffs demonstrated that they had changed their position in reliance on Fairchild's misrepresentations by foregoing their rights to sue under title VII. *Miller* is thus readily distinguishable from the present case, where plaintiff has shown only that Up-Right engineered his resignation without good cause by telling him his position had been eliminated.[1]

■ One additional point remains to be made. *Foley* and succeeding cases, as we have seen, reaffirmed the availability of tort damages for dismissal in violation of public policy. (See, e.g., *Rojo* v. *Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373]; *Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th 1083.) We have held that an action for wrongful termination in violation of public policy must be predicated on a fundamental, well-established, substantial policy that concerns society at large rather than the individual interests of the employer or employee (*Foley, supra,* 47 Cal.3d at pp. 669-670), and that is delineated in some constitutional or statutory provision. (*Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at p. 1095.) It is suggested that the fraud cause of action serves to vindicate such a public policy. While fraud and deceit are defined by statute (see Civ. Code, §§ 1572, 1573, 1709, 1710, 3294), and while fraudulent conduct is generally condemned by society, we cannot agree that the prohibitions embodied in the statutes concern society at large in the *Foley* sense. At root, fraud and deceit affect only the individual interests of the employer and employee. A claim of fraud or deceit is essentially a private dispute seeking a monetary remedy, not an action to vindicate a broader public interest.

Although tort damages are unavailable in this case, Hunter has established his claim to contractual damages for constructive wrongful termination, and on remand the judgment must be modified accordingly.[2]

---

[1]Justice Mosk's dissent predicates disagreement with our conclusion on a series of inapposite cases dealing with the doctrine of promissory fraud. This is not a case of promissory fraud, and nothing in this opinion affects the availability of tort damages in any case in which the elements of promissory fraud are pleaded and proved. And, contrary to Justice Mosk's dissent, we do not believe there is a meaningful difference between the case of the employee who is wrongfully terminated by means of a misrepresentation that good cause exists (when in fact no such good cause exists), and that of the employee who is misled into resigning by means of a misrepresentation. Justice Mosk contends that in the latter situation the employer has "concealed" its "hostility to the employee's contractual rights." We doubt that *any* wrongfully terminated employee can be said to be unconscious of the former employer's "hostility" to his or her contractual rights.

[2]Contrary to the representation made at oral argument by counsel for Hunter, it is clear from the special verdict form completed by the jury in this case that those damages over and above the $38,013 awarded on the contractual claims represented the jury's determination of the injury attributable to the fraud claim. Counsel's representation as to the jury's intention in returning the verdict of $120,000 in damages for misrepresentation is not supported by evidence in the record and we accord it no weight.

DISPOSITION

The judgment of the Court of Appeal is reversed. The judgment entered in Fresno County Superior Court Case No. 387274-4 must be modified, in accordance with this opinion, to provide that judgment is rendered in favor of Charles R. Hunter against Up-Right, Inc., in the sum of $38,013 plus costs of suit.

Lucas, C. J. Baxter, J., and George, J., concurred.

**MOSK, J.**—I dissent. The record in this case reveals that plaintiff was deceived into resigning so that the employer could terminate his employment without the risk of a wrongful discharge lawsuit. Six months after his discharge, plaintiff accidentally discovered that the inducement to resign, based on representations his position was about to be eliminated, had been a ruse. The majority hold that the use of fraud in the termination of an employment contract under these circumstances is not actionable, and that only a breach of contract action lies.

Contrary to the majority's reasoning, the result of this case is not dictated by the four-to-three decision in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (hereafter *Foley*). Nor is it rational to conclude that a fraud claim in a wrongful termination suit is indistinguishable from breach of contract. The majority opinion inexplicably revises the law of fraud to exclude fraudulent termination of employment contracts.

I.

The majority claim to base their opinion primarily on *Foley*. That case rejected the contention that an action for breach of an implied covenant of good faith and fair dealing in an employment contract could sound in tort. The court reasoned that the implied covenant of good faith and fair dealing "is a contract term" and "compensation for its breach has almost always been limited to contract rather than tort remedies." (*Foley, supra,* 47 Cal.3d at p. 684.) The covenant of good faith, rather than having a life independent of the contract, is essentially a gap filler that " 'effectuate[s] the intentions of the parties, or . . . protect[s] their reasonable expectations.' " (*Ibid.*) For this reason, it was concluded that the breach of the covenant warranted only contract damages.

*Foley* recognized, however, that there was at least one important exception to this general rule: bad faith in the context of insurance contracts. In that

circumstance, a "special relationship" was said to exist, based on the insured's markedly inferior bargaining power to the insurer, the insured's repose of trust in the insurer, and the insured's attempt to secure an essential service or product, as opposed to pecuniary gain in the ordinary commercial sense. If, under these circumstances, " 'there is conduct on the part of the defendant indicating an intent to frustrate the weaker party's enjoyment of the contract rights,' " then courts are justified in using tort as well as contract remedies to enforce a public policy of fair dealing. (*Foley*, *supra*, 47 Cal.3d at pp. 690-691.) This court then concluded that no such special relationship existed between employers and employees, and that there was therefore no need to elevate the implied covenant of good faith and fair dealing above the realm of contract law in wrongful termination cases.

*Foley* nowhere held that actions for traditional intentional torts which might accompany a wrongful discharge are barred. The opinion did declare that "we believe that focus on available contract remedies offers the most appropriate method of expanding available relief for wrongful termination" because the "expansion of tort remedies in the employment context has potentially enormous consequences for the stability of the business community." (*Foley*, *supra*, 47 Cal.3d at p. 699.) This statement should be viewed in its proper context: merely an additional reason why the usual rule that the action for breach of an implied covenant of good faith and fair dealing sounds in contract and not in tort should be followed in a case involving ordinary employment contracts.

Fraud, unlike breach of the implied covenant of good faith and fair dealing, has long been recognized as an independent tort which may arise together with, but is distinct from, a breach of contract. (See Prosser & Keeton, Torts (5th ed. 1984) § 105, p. 728 [the tort action for fraud, differentiated from contract actions for breach of warranty, emerged clearly in the late 18th century].) Thus, in cases of promissory fraud, where it is claimed that the defendant entered into an agreement with the knowledge that he intended to breach the agreement, both the breach and the fraud leading to the breach are separately actionable. (See *Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 994-996 [149 Cal.Rptr. 119] [hereafter sometimes *Walker*].) Whereas the breach of the covenant of good faith and fair dealing may involve acts of deliberate deception, a defendant crosses the boundary of mere bad faith and commits fraud when he induces a plaintiff to reasonably rely on these deceptions to his detriment, and damages result.

Consequently, while the duty to treat a party with whom one enters into contract in good faith can be seen as only a contractual duty, the obligation

to refrain from committing fraud is a duty imposed by society to govern commercial and other human relationships, regardless of whether those relationships are contractual. And, unlike the tortious breach of the covenant of good faith and fair dealing, the tort of fraud has never depended on the existence of a "special relationship" between the tortfeasor and the tort victim. As this court stated over 100 years ago: " 'It may safely be averred that all deceitful practices in depriving or endeavoring to deprive another of his known right by means of some artful device or plan, contrary to the rules of common honesty, is fraud.' " (*Newman* v. *Smith* (1888) 77 Cal. 22, 26 [18 P. 791].) Nothing in *Foley* alters the availability of a fraud action when a plaintiff is the victim of such deceitful practices.

## II.

A closer reading of the majority's opinion reveals that their conclusion proceeds not so much from the dictates of *Foley*, but from the conviction that a fraud action in this case is conceptually indistinguishable from an ordinary breach of contract action. As the majority declare: "The problem with the Court of Appeal's analysis is that the result of Up-Right's misrepresentation is indistinguishable from an ordinary constructive wrongful termination. The misrepresentation transformed what would have otherwise have been a resignation into a constructive termination. . . . Up-Right simply employed a falsehood to do what it otherwise could have accomplished directly. It cannot be said that Hunter relied to his detriment on the misrepresentation in suffering constructive dismissal. Thus, the fraud claim is without substance." (Maj. opn., *ante*, at p. 1184.)

The majority appear to suggest in this curious paragraph that plaintiff has no fraud cause because his claim lacks one of the necessary elements of fraud—plaintiff's detrimental reliance. This concept is never developed, and understandably so. According to the evidence in this case, plaintiff would not have resigned from his job, which was terminable only for good cause, *but for* his reliance on his supervisor's false representations that the loss of his job due to the elimination of his position by the corporation was imminent.

Instead, the majority base their holding on the determination that, since the fraud action is merely a constructive wrongful termination action in another guise, it should not give rise to tort damages. In rejecting the possibility that "a misrepresentation made by the employer to effect termination could ever rise to the level of a separately actionable fraud," the majority declare that "such misrepresentations are merely the means to the end desired by the employer, i.e., termination of employment." (Maj. opn.,

*ante*, at p. 1185.) Therefore, "no independent fraud claim arises from a misrepresentation aimed at termination of employment." (Maj. opn., *ante*, at p. 1185.)

I disagree. The majority disregard the important difference between fraud and contract claims in this context, and the different wrongs they are designed to rectify. In ignoring this distinction, the majority inexplicably overlook common law fraud as it has developed in California and other jurisdictions.

As discussed above, fraud and contract claims are often brought conjointly, and plaintiffs have been allowed recovery both in tort and contract. (*Walker* v. *Signal Companies, Inc.*, *supra*, 84 Cal.App.3d 982, 994-996.) In *Walker*, the plaintiff required a residence to be constructed 180 days after entering into agreement with his building contractor, in order to realize certain capital gains benefits. The actual construction extended well beyond that period. The plaintiff sued for both fraud and breach of contract, claiming that the defendant knew at the outset that it could not complete construction within the required time, and a jury awarded the plaintiff both compensatory and punitive damages. The *Walker* court denied the plaintiff a double recovery in tort and contract for compensatory damages, but did permit additional punitive damages to be recovered on the fraud claim,[1] even though the plaintiff was damaged in the same amount as he would have been had the defendant not defrauded him, but merely breached the contract due to unforeseeable circumstances. (*Walker*, *supra*, at pp. 994-996.)

The reason for this dual recovery in tort and contract is to be found in the differing rationales behind the two bodies of law. "Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.' " (*Foley*, *supra*, 47 Cal.3d at p. 683, citation omitted.) Because of its concern with social policy, "[t]he

---

[1]There is some ambiguity in the record as to whether plaintiff in this case was in fact entitled to the full damage award. It is correct, as the *Walker* court held, that double recovery for tort and contract *compensatory* damages is improper, though separate tort punitive damages may be granted. (See *Tavaglione* v. *Billings* (1993) 4 Cal.4th 1150, 1159 [17 Cal.Rptr.2d 608, 847 P.2d 574].) In this case, however, no punitive damages were awarded. Evidence was presented of $38,013 of past economic losses and $146,456 in future losses. By special verdict, plaintiff was awarded $38,013 on the contract theory and $120,000 on the fraud theory, and it was stipulated that the total award would be $120,000. It is difficult to surmise, given the lack of clarity in the jury instructions, if the $120,000 was based in part on the future economic loss evidence presented and whether that evidence was sufficient to sustain the $120,000 verdict. The question of the propriety of the compensatory damages award should be resolved on remand. That question is, of course, very different from the question whether a fraud action, with its potential for punitive damages, is permissible in these circumstances.

'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim but with admonition of the wrongdoer. . . . Not infrequently one reason for imposing liability is the deliberate purpose of providing [the] incentive [for preventing the occurrence of future harm]." (Prosser & Keeton, Torts, *supra*, § 4, at p. 25.)

Thus, in the promissory fraud cases, tort recovery is allowed, despite the fact that fraud and contract damages arise from the same set of facts, because the judicial system seeks to vindicate a social policy of preventing injurious, deliberate falsehoods. Although it is a fact of life that parties breach contracts because of changes in circumstance, the tort system is used to send a signal that the breach of a contract a party calculatingly never intended to fulfill is a different, and greater, wrong than an ordinary breach, and should receive greater sanction.

The circumstances in the present case are analogous to promissory fraud. Although plaintiff's damages are presumably the same for being tricked into resigning as they would be if he had been simply wrongfully discharged outright, the former behavior involves a fraud for which the law of tort provides special disincentives. The purpose of the fraud in this case, as the jury fairly inferred, was to dupe plaintiff into forfeiting his contractual and employment rights by deceiving him into resigning. The corporation sought through this artful deception to extricate itself from its contractual obligations, rather than to straightforwardly discharge him and risk potential liability for breach of contract. The law of fraud is designed to deter the use of such stratagems.

This conclusion is in accord with California case law. In the recent case of *Marketing West, Inc.* v. *Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603 [7 Cal.Rptr.2d 859], the plaintiffs, as sales representatives for defendant corporation, alleged the corporation breached its contract to terminate them only for good cause. The plaintiffs also alleged an independent action for fraudulent concealment, based on the allegation the defendant deceived them into signing a written agreement providing that their contract with the defendant would be terminable at will. The plaintiffs alleged the defendant hid from them the fact that the effect of the written agreement would be to amend the termination-for-cause provisions of their oral contract. The court held that the plaintiffs' fraudulent concealment action presented a triable issue that should survive summary judgment. (*Id.* at pp. 613-614.) The *Marketing West* court clearly recognized, as the majority here do not, that fraud may be employed in the termination of an employment contract, and that such fraud is actionable.

In *Livett* v. *F.C. Financial Associates* (1981) 124 Cal.App.3d 413 [177 Cal.Rptr. 411] (hereafter *Livett*), the plaintiff was an independent contractor who had an agreement with defendant property owners to assist in the development of a 32-acre tract of land. The agreement provided that it could be terminated if the prospective development proved to be financially unfeasible. (*Id.* at p. 416.) In the preliminary stages of development, the project encountered difficulties, which eventually led the defendant bank, as the deed of trust holder on the property, to foreclose. This effectively terminated the plaintiff's agreement. The plaintiff claimed that the property owner/defendants breached their contract. He also claimed that these defendants, together with the bank, engaged in a conspiracy to defraud him out of the compensation due under the agreement by engaging in a sham foreclosure, so as to make it appear that the development was no longer financially feasible. (*Id.* at p. 417.) Although the case focused on the issue of when the statute of limitations begins to run in a conspiracy case, its facts provide another example of a contract that was fraudulently terminated in order to absolve the breaching party of its contractual obligations.[2]

Contrary to the majority's conclusion, we should hold that *the means of discharging an employee does matter*. An employee, who because of a contractual agreement with his employer can only be fired for good cause, is tortiously defrauded when the employer not only breaches the contract by engineering the employee's termination, but also uses deliberate falsehoods to cause the employee to forfeit his contractual rights. It does not matter that, in this case, the fraud was not completely successful, in that Hunter, six months after his discharge, accidentally learned the truth of the deception and sought proper legal remedies. A cause of action for the tort of fraud is designed to protect future victims of such deception as much as it is designed to compensate Hunter in this case. (See *Ramey* v. *General Petroleum Corp.* (1959) 173 Cal.App.2d 386, 397 [343 P.2d 787] [fraud action allowed against defendant/employer who intentionally concealed from employee his right of action against a third party for an industrial injury].)

It must also be recognized that the majority's holding is in conflict with wrongful termination contract cases outside of the employment context. In *Houston Cable TV* v. *Inwood W. Civic Ass'n* (Tex.Ct.App. 1992) 839 S.W.2d 497, for example, a cable company entered into agreements with various homeowners associations in which the associations would grant rights-of-way to the cable company on behalf of its members, in exchange for a certain percentage of gross revenue. When the cable company had achieved

---

[2]The *Livett* case involved a claim of conspiracy, rather than one of fraud, because the fraud claim was at that point clearly time-barred. (*Livett, supra,* at p. 418.) As is evident from the facts, the conspiracy in question was a conspiracy to defraud.

nearly complete penetration of the market, it attempted to terminate the right-of-way agreements by falsely informing the homeowners associations that the cable company was prohibited by a new federal law from continuing payments to the associations. The cable company was thereby able to terminate most of the right-of-way contracts without the homeowners associations becoming aware that the contracts had been breached. (*Id.* at p. 504.) Some of the associations, however, subsequently discovered the cable company's deception and sued for breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing. The Texas Court of Appeals upheld a jury verdict in the plaintiffs' favor for punitive damages on the fraud claim. (*Ibid.*)[3] The court recognized that fraud may be used to terminate contracts, and such fraud is independently actionable. The majority here, on the other hand, arbitrarily elect to except employment contracts from the rule that fraudulently terminated contracts are subject to the sanctions of tort law.

Because the majority create a significant innovation in the doctrine of fraud, it is to be expected that some discussion of that body of law might possibly support its holding. But the majority make only passing reference to the law of fraud. Instead, other than their misplaced reliance on *Foley, supra,* 47 Cal.3d 654, the majority cite in support two Court of Appeal cases not involving the tort of fraud. (*Hine* v. *Dittrich* (1991) 228 Cal.App.3d 59 [278 Cal.Rptr. 330] [alleging a tort of "negligent supervision"], and *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390 [3 Cal.Rptr.2d 6] [alleging a number of intentional and negligent torts].) Both cases share with the majority an unwarranted expansive reading of *Foley.* More importantly, the opinions are not apposite because in neither case did the court find that an employment contract had been breached. (*Hine, supra,* 228 Cal.App.3d at p. 65 [plaintiff failed to allege contract was other than at will]; *Soules, supra,* 2 Cal.App.4th at pp. 400-401 [demotion of plaintiff did not give rise to constructive wrongful discharge].) The distinction is critical, for, in termination cases where no contract has been breached, fraud claims can be dismissed for lack of damages. In these cases, the deceit does not cause the plaintiff to forfeit his contractual rights, since he has no rights to forfeit. Plaintiff in the instant case, on the other hand, proved that the termination-for-cause provisions of his employment contract had been breached, and that the fraudulent manner of the termination was used to conceal the breach. All the elements of fraud

---

[3]The court found that the award of punitive damages was independently justified by both the fraud and the tortious breach of the covenant of good faith and fair dealing claims. (See *Houston Cable TV* v. *Inwood W. Civic Ass'n, supra,* 839 S.W.2d at p. 504.)

are present, and there is no reason why Hunter's fraud claim should be denied.[4]

## III.

Finally, the majority seem to rely for their holding on the speculative statement that to allow a fraud claim in this case would potentially "cause adverse consequences for industry in general. Fraud is easily pleaded, and in all likelihood it would be a rare wrongful termination complaint that omitted to do so. Much harder, however, is the defense of such claims and their resolution at the summary judgment or demurrer stage of litigation. The resultant costs and inhibition of employment decisionmaking are precisely the sort of consequences we cited in *Foley* in disapproving tort damages for breaches of the implied covenant of good faith and fair dealing." (Maj. opn., *ante*, at p. 1185.)

Although, unlike the majority, I lack the prescience to predict the effects our holding will have on industry, I would contest their conclusion that, were we to hold for plaintiff in this case, the floodgates of wrongful termination fraud claims would open. Similar scare tactics have been used often in recent years to defeat valid claims. On the contrary, however, the situation presented by this case is unusual. In order to survive summary judgment, a plaintiff would have to show at the outset that his employment contract is not terminable at will, an issue that itself is becoming increasingly amenable to resolution at the summary judgment stage. (See, e.g., *Slivinsky* v. *Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 805-806 [270 Cal.Rptr. 585]

---

[4]The majority, while acknowledging that the question of workers' compensation's exclusivity is not before us, nonetheless conduct a cursory review of a recent line of cases to imply that this fraud cause of action would be barred by workers' compensation exclusive remedy provisions (Lab. Code, § 3600 et seq.). But neither *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743], *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1 [276 Cal.Rptr. 303, 801 P.2d 1054], nor *Livitsanos* v. *Superior Court* (1992) 2 Cal.4th 744 [7 Cal.Rptr.2d 808, 828 P.2d 1195] resolves the question whether the employer, in committing this fraud, stepped out of its "proper role," and thereby committed a tort beyond the scope of workers' compensation. (*Cole, supra*, 43 Cal.3d at p. 161; *Shoemaker, supra*, 52 Cal.3d at p. 16; *Livitsanos, supra*, 2 Cal.4th at p. 756.) We have, indeed, held that certain forms of fraud are not barred by workers' compensation. (*Johns-Manville Products Corp.* v. *Superior Court* (1980) 27 Cal.3d 465, 474-478 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758] [fraudulent concealment of injury actionable in tort]; see also *Ramey* v. *General Petroleum Corp., supra*, 173 Cal.App.2d 386, 402 [action for fraud against employer who concealed from him his right to medical care and suit against third party].)

Even more critically, plaintiff's injury in this case was primarily economic, rather than physical or mental. As such, it is to be doubted that such injury would be barred by the worker's compensation exclusive remedy provisions. (See *Coca Cola Bottling Co.* v. *Superior Court* (1991) 233 Cal.App.3d 1273, 1290-1291 [285 Cal.Rptr. 183].) In any case, the issue of whether the present action may be barred by workers' compensation is a complex one that merits thorough briefing and analysis, and may not be disposed of in the majority's vague and peremptory fashion.

[summary judgment proper on wrongful termination/breach of contract issue, where integrated agreement providing contract was at will precludes inferences to the contrary].) If an employer merely sought tactfully to "let down easy" an at-will employee by telling him the discharge was due to layoff for lack of work rather than incompetence, the employee could not allege, much less prove, fraud, because he could not show that he would have kept his job or other employment rights but for the misrepresentation.

Moreover, even if an employment contract terminable for good cause is established, representations likely to be made in the course of a termination may not be actionable as fraud. The reasonable employee fired without good cause generally will not forfeit contractual rights because of the employer's statements; the employee will typically recognize in this situation that he and the employer are in an adversarial position, and the employee will have the opportunity to contest the employer's position that good cause for termination existed via a breach of contract action. Without the element of detrimental reliance, the employer is at most guilty of bad faith, and a breach of contract action would be the employee's only resort.

However, when the employer makes a factual misrepresentation which seeks to circumvent the good cause provisions of the employment contract by misleading the employee into resigning, thereby concealing the employer's hostility to the employee's contractual rights, that employer crosses the line from bad faith to outright fraud, and tort liability should be permitted.[5] The majority simply fail to acknowledge the reality that an employee so deceived is in a different, and worse, position than an employee who is straightforwardly discharged, either actively or constructively.

In sum, it is unwarranted speculation—indeed, use of an all too common the-sky-is-falling theme—to conclude that allowance of the fraud action in this case will significantly expand the number of unmeritorious fraud/wrongful termination actions. Using traditional analysis of the tort of fraud, many of the would-be tort plaintiffs, conjured up by the majority, the defendants, and the amici curiae in this case, would not in fact prevail. At

---

[5]Nor should the position of this dissenting opinion be considered a blanket endorsement of all forms of tort recovery in wrongful termination cases. It is a separate question whether, for example, the tort of negligent misrepresentation, arising out of a wrongful termination will be independently actionable. Since double recovery for identical damages on tort and contract theories are not permitted, and since nonintentional torts will rarely give rise, as a matter of law, to punitive damages (see, e.g., Bell v. Sharp Cabrillo Hospital (1989) 212 Cal.App.3d 1034, 1043-1048 [260 Cal.Rptr. 886]), the allegation of negligent misrepresentation in wrongful termination cases will be, in most instances, superfluous. Other intentional torts, such as the intentional infliction of emotional distress, may be barred by the exclusive remedy provisions of workers' compensation law. (Cole v. Fair Oaks Fire Protection Dist., supra, 43 Cal.3d 148, 161.)

the same time, deserving plaintiffs such as Hunter will be able to receive damages, and the social policy of discouraging deliberate injurious falsehoods embodied in the tort of fraud will be vindicated.

For all of the foregoing, I would affirm the judgment of the Court of Appeal, subject to the caveat expressed in footnote 1 of this dissenting opinion.

Arabian, J., concurred.

**KENNARD, J.,** Dissenting.—Plaintiff Charles Hunter worked as a welder for defendant Up-Right, Inc., from January 1973 until September 1987. He was considered an excellent employee. On September 10, 1987, Hunter's supervisor induced him to resign by falsely telling him that his position was being eliminated because of a corporate reorganization. Six months later, Hunter learned of the fraud. He then brought this action. The jury awarded Hunter damages of $38,013 for breach of contract and $120,000 for the fraud.

The issue is whether an employee may recover tort damages for fraud perpetrated by the employer for the purpose of concealing from the employee his or her rights under the employment contract. The majority, relying primarily on this court's decision in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), holds that the employee's recovery is limited to contract damages. According to the majority, fraud is indistinguishable from a constructive wrongful termination because the employer "simply employed a falsehood to do what it otherwise could have accomplished directly," that is, terminated employment. (Maj. opn., *ante*, at p. 1184.) In any event, the majority concludes, "[i]t cannot be said that Hunter relied to his detriment on the misrepresentation in suffering constructive dismissal." (*Ibid.*) The majority is wrong. As Justice Mosk points out in his dissent, this court's decision in *Foley* does not govern this case. (Dis. opn. of Mosk, J., *ante*, at pp. 1187-1188.)

Contrary to the majority's conclusion in this case, the fraud that the employer perpetrated upon the employee cannot be deemed a constructive wrongful termination. Properly analyzed, fraud is readily distinguishable from constructive wrongful discharge. The latter occurs when an employee is forced to resign as a result of actions or conditions so intolerable that a reasonable person in the employee's position would have resigned, and the employer—with actual or constructive knowledge of the intolerable actions or conditions and their impact on the employee—could have remedied the situation but did not. (*Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 399

[3 Cal.Rptr.2d 6]; *Zilmer* v. *Carnation Co.* (1989) 215 Cal.App.3d 29, 38 [263 Cal.Rptr. 422].) Constructive wrongful discharge may occur when an employee leaves because of intolerable physical working conditions (see, e.g., *Panopulos* v. *Westinghouse Electric Corp.* (1989) 216 Cal.App.3d 660, 664-665, 667 [264 Cal.Rptr. 810]), racial discrimination (see, e.g., *Valdez* v. *City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056-1057 [282 Cal.Rptr. 726]), or a myriad of other intolerable actions, including fraud. Indeed, the intolerable action could consist of a physical assault.

Constructive wrongful termination is the legal consequence of the employer's conduct; it is not the conduct itself. No one would seriously contend that a physical assault—one of the many intolerable types of conduct by an employer that may cause a constructive discharge—is indistinguishable from a wrongful termination because the employer could have terminated the employee by other means. Characterizing the consequence of the employer's conduct as constructive discharge, as the majority does here, does not address the question of whether the conduct itself is actionable in contract, in tort, or under other civil legal principles.

Detrimental reliance is an essential element of fraud. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 676, 711, pp. 778, 810-811.) The facts of this case do not support the majority's conclusion that Hunter did not detrimentally rely on his employer's fraudulent misrepresentation in resigning. Because the employer might have accomplished the termination in another manner does not mean that Hunter did not detrimentally rely on the fraud. Hunter did rely on the fraud: he resigned.

In my view, there are two analytic approaches that may entitle the employee to recover in tort for the employer's fraud. First, when, as here, an employer resorts to fraud to deprive an employee of his or her rights, the employer's conduct is not within the scope of the contractual employment relationship. (See *Johns-Manville Products Corp.* v. *Superior Court* (1980) 27 Cal.3d 465, 477 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758]; see generally, *Livitsanos* v. *Superior Court* (1992) 2 Cal.4th 744, 754-755 [7 Cal.Rptr.2d 808, 828 P.2d 1195]; *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 16 [276 Cal.Rptr. 303, 801 P.2d 1054]; *Cole* v. *Fair Oaks Protection Dist.* (1987) 43 Cal.3d 148, 161 [233 Cal.Rptr. 308, 729 P.2d 743].) Second, the employer's misconduct in this case did not have as its sole objective a wrongful termination of employment. The misconduct included the additional unlawful objective of preventing the employee from learning of and enforcing his contractual rights. Because under my approach the defrauded employee is entitled to recover tort damages under either of these two analytic approaches, it is not necessary in this case to decide which of these two approaches is preferable.

I find the practical effect of the majority's opinion most troubling. An employer who has decided to wrongfully terminate an employee now has nothing to lose by accomplishing that termination through the means of fraud. Indeed, the employer has everything to gain—if the fraud succeeds, the employee will never discover the true reason for the termination, and will never trouble the employer with a wrongful termination action.

I would affirm the judgment of the Court of Appeal.

Respondent's petition for a rehearing was denied January 20, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.