# IN THE SUPREME COURT OF CALIFORNIA

MICHAEL R. RATTAGAN,

Plaintiff and Appellant,

v.

UBER TECHNOLOGIES, INC.,

Defendant and Respondent.

S272113

Ninth Circuit

20-16796

Northern District of California

3:19-CV-01988-EMC

August 22, 2024

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

RATTAGAN v. UBER TECHNOLOGIES, INC.

S272113

Opinion of the Court by Corrigan, J.

At the request of the United States Court of Appeals for the Ninth Circuit, we consider a question expressly left open in *Robinson Helicopter v. Dana Corp.* (2004) 34 Cal.4th 979 (*Robinson*). Under California law, may a plaintiff assert a tort claim for fraudulent concealment arising from or related to the performance of a contract?[1] The answer to the question is a qualified yes. A plaintiff may assert a fraudulent concealment cause of action based on conduct occurring in the course of a contractual relationship if the elements of the claim can be established independently of the parties' contractual rights and obligations, and the tortious conduct exposes the plaintiff to a risk of harm beyond the reasonable contemplation of the parties when they entered into the contract.

## I. BACKGROUND

### A. *Factual Allegations*

This case comes to us following dismissal of Michael R. Rattagan's third amended complaint (TAC) without leave to amend. (Fed. Rules of Civ. Proc., rule 12(b)(6).) In answering

---

[1] The Ninth Circuit framed the issue as follows: "Under California law, are claims for fraudulent concealment exempted from the economic loss rule?" We restated the question to conform to a better understanding of *Robinson* and the dispositive issue presented in this case. (Cal. Rules of Court, rule 8.548(f)(5).)

the Ninth Circuit's question, we assume all factual allegations in the TAC to be true. (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1137−1138.) Rattagan is a citizen of Argentina and describes himself as "one of the top and most renowned business lawyers in Buenos Aires." He is licensed to practice law in Argentina and the State of New York. At all relevant times, he was the managing partner of Rattagan Macchiavello Arocena, a law firm that "counsels large multinational companies in various business matters, with an emphasis on transactions, investments and interests in Argentina."

In February 2013, a representative of two Dutch subsidiaries of defendant Uber Technologies, Inc. (Uber) contacted Rattagan.[2] Uber was considering launching its ridesharing platform in Argentina and sought local counsel to assist with the process. Under the direction of Uber's legal department in San Francisco, the Dutch subsidiaries retained Rattagan and his firm to provide specific legal services, including reserving the corporate name "Uber Argentina, S.A." (Uber SA); registering the Dutch subsidiaries as Uber SA's foreign shareholders; creating all the corporate formation documents for Uber SA; and registering Uber SA with the Buenos Aires Office of Corporations (the *Inspección General de Justicia* or IGJ). The complaint alleges the Dutch subsidiaries

---

[2] Uber is a corporation organized under Delaware law with its principal place of business in San Francisco. At all relevant times, Uber was the sole shareholder of one of the Dutch entities, Uber International B.V., which in turn was sole shareholder of the other, Uber International Holding B.V. Both Dutch subsidiaries are limited liability companies organized under the laws of the Netherlands.

were merely acting as agents for their principal, Uber, when Rattagan was retained in 2013, making Uber responsible for all the actions of the Dutch subsidiaries based on an agency relationship.

Rattagan also agreed to act as the Dutch subsidiaries' registered legal representative in Argentina. He characterizes this arrangement as being "separate and apart from the legal services provided." According to the TAC, any foreign company intending to do business in Argentina must register with the IGJ and submit certain required documents, including details about the foreign company's shareholders. Additionally, the foreign shareholders must be represented by a "local resident registered with the IGJ" who acts as the "human face of that entity in Argentina." Before taking on this additional role, Rattagan expressly warned Uber in writing of the "full potential personal exposure" he might face as legal representative if the Dutch subsidiaries violated Argentinian law.

Rattagan and the Dutch subsidiaries also entered into indemnity agreements. The agreements provide that the subsidiaries would hold Rattagan "harmless from any action, suit or proceeding, pending or threatened, whether civil, criminal, administrative or investigative . . . by reason of the fact that the Legal Representative is or was legal representative of the Company" and "indemnifie[d] . . . against any and all liabilities and expenses (including reasonable attorneys' fees and expenses), payable by [Rattagan] in connection with the defense or settlement of any such action, suit or proceeding, or any appeal with respect thereto . . . ." Additionally, the agreements state, "[t]he Company acknowledges that the Legal Representative was not, is not and will not become familiar with the day-to-day operations of the Company or of Uber Argentina

S.A. and was not, is not and will not be required to undertake any executive or managerial responsibilities with respect thereto." Rattagan prepared papers reflecting that he would act as the Dutch subsidiaries' legal representative and registered with the IGJ using his firm's address.

Rattagan and his colleagues provided legal advice and drafts of corporate formation documents to the Dutch subsidiaries throughout 2013. In 2014, there was a "period of relative inactivity." In February 2015, efforts once again ramped up to form a corporation in Argentina, but this time Uber began managing Rattagan's work directly through its San Francisco-based paralegals, Ryan Black and Shirin Schokrpur. Rattagan claims it was at this point Uber established a direct attorney-client relationship with him. Rattagan and his firm continued providing incorporation services to Uber throughout 2015 into 2016. By then, Uber had changed direction and decided to create *two* Argentine entities, Uber S.R.L. and Hinter Argentina, S.R.L. Rattagan's firm began the process of forming and registering these new entities with the IGJ while he continued to act as the Dutch subsidiaries' registered legal representative.

Between December 2015 and April 12, 2016, Rattagan contends that, unbeknownst to him, Uber representatives repeatedly met with Buenos Aires city officials. On December 17, 2015, Gonzalo Araujo, Uber's Head of Public Policy and Government Affairs in South America, met with Juan Jose Méndez, the Secretariat of Transportation for the City of Buenos Aires. Méndez rejected Uber's position that it was a technology company, not subject to local regulations governing transportation providers. Two additional meetings took place in January and February 2016 with city officials and Carl

Meacham, Uber's Head of Public Policy and Government Relations based in Washington D.C. City officials warned Meacham against launching Uber's ridesharing platform in Buenos Aires unless all its drivers had professional driver's licenses and commercial insurance coverage, and all their vehicles were examined and approved by the city.

In March 2016, the IGJ requested that Rattagan provide certain changes to Uber S.R.L.'s bylaws describing its corporate purpose. On March 22, 2016, Leonardo Orlanski, a Buenos Aires lawyer retained by Uber to handle government relations, told Rattagan not to file the modifications requested by the IGJ until Orlanski could "check some implications on the regulatory front." Rattagan contends at some point before that conversation, Uber had secretly decided to launch its ridesharing platform in Buenos Aires sometime in April 2016. They did not inform him of that decision, even though the local corporate entities were still in formation and had not yet been registered with local or federal tax authorities. Over the next few weeks, Rattagan exchanged several emails and phone calls with Orlanski, Black, Schokrpur, and Enrique Gonzalez, Uber's Head Counsel for Latin American Operations. He alleges they intentionally concealed Uber's launch plans even though they knew local government authorities would consider the launch to constitute "a legally non-compliant and tax evasive transportation business" and Rattagan would consequently be exposed to "grave personal consequences" given his position as the Dutch subsidiaries' registered legal representative.

Uber officially launched its ridesharing platform in Buenos Aires on April 12, 2016. Rattagan learned about it "like everyone else — through an email blast." Public reaction was immediate and hostile, sparking violent demonstrations in the

streets of Buenos Aires. Rattagan's office was at one point surrounded by protesters who blocked the exits for hours. The day after the launch, Rattagan contacted Head Counsel Gonzalez and offered to "smooth things over" with local government officials on Uber's behalf, while also hoping to avoid further damage to himself and his colleagues. Gonzalez declined the offer and instead instructed Rattagan to continue with the incorporation process of Uber S.R.L. and Hinter Argentina, S.R.L.

Several key events took place on April 15, three days after the launch. Rattagan emailed Gonzalez asking to be replaced as the Dutch subsidiaries' legal representative. According to Rattagan, Gonzalez failed to act immediately on his request and more than two months elapsed before Uber removed him as the Dutch subsidiaries' legal representative. Also on April 15, a Buenos Aires city inspector came to Rattagan's offices with orders "to immediately cease [Uber's] activities." Police later raided his offices armed with a search warrant based on a charge that Rattagan, as the Dutch subsidiaries' legal representative, was using public space for commercial gain without a permit. Prime-time news reported the raid and displayed Rattagan's firm logo, reporting his offices were the location of "Uber's illegal activities, which included tax evasion." As a result, Rattagan claims he and his colleagues were "vilified in the media and subjected to scorn and ridicule in social and professional gatherings."

On May 12, 2016, Rattagan met personally with Gonzalez for the first time since the launch of the ridesharing platform and the raids on his offices. Rattagan repeated that he and his colleagues had resigned and demanded that Uber replace them in all official documents filed with the IGJ. He contends

Gonzalez disregarded the request and continued to use his firm's name and address in informal correspondence with city officials. Two weeks later, Rattagan sought direct involvement from Salle Yoo, Uber's General Counsel and Corporate Secretary based in San Francisco. He asked that she designate someone to whom he could turn over his client files and demanded that Uber refrain from using his name as Uber's representative or his offices as its legal domicile in future communications with Argentine government officials. Yoo assigned another Uber attorney based in San Francisco to handle the matter.

In April 2017, Rattagan was formally charged with unauthorized use of public space with a commercial aim and aggravated tax evasion. He was subjected to interrogation, mugshots, and fingerprinting. He was also temporarily banned from traveling abroad, which negatively affected his practice. He alleges news of the travel ban "went viral," further exacerbating the reputational harm. Rattagan claims Uber paid his criminal defense legal fees under "an indemnity agreement" but "ceased doing so after he filed this lawsuit."

## B. *Procedural Background*

On April 12, 2019, Rattagan filed a complaint in federal district court against Uber and the Dutch subsidiaries asserting causes of action for breach of fiduciary duty, deceit, fraud, intentional infliction of emotional distress, and negligence. Shortly after the complaint was filed, Uber's counsel informed Rattagan's counsel that the complaint was fatally flawed because he was a foreign plaintiff suing foreign defendants, which destroyed grounds for diversity jurisdiction.

On May 8, 2019, Rattagan filed a first amended complaint

(FAC), this time naming Uber as the sole defendant and removing the allegation that Uber controlled and directed all operational decisions of his clients, the Dutch subsidiaries. Otherwise, the FAC was largely unchanged from the original complaint. Uber moved for sanctions under Federal Rules of Civil Procedure, rule 11, arguing Rattagan's claims were based on the demonstrably false premise that an attorney-client contractual relationship existed between Rattagan and Uber when in fact he had previously alleged the Dutch subsidiaries had retained him. Uber also filed a rule 12(b)(6) motion to dismiss the FAC. The district court granted Uber's sanctions request on the grounds that "Rattagan presented the Court with a complaint that was inaccurate and misleading." The district court stated, "While Mr. Rattagan could have advanced a theory that Uber [] was somehow legally responsible based on its indirect control over [the Dutch subsidiaries] with whom Mr. Rattagan contracted (whether via an alter ego or other theory), Mr. Rattagan deleted that allegation and worded the FAC so as to imply a direct relationship with Uber . . . ." The district court dismissed the FAC with leave to amend.

On September 18, 2019, Rattagan filed a second amended complaint. However, the day before Uber's deadline to respond, Rattagan's counsel sought leave to withdraw. The court granted the attorney's request and extended Uber's deadline to respond. On May 6, 2020, Rattagan's new counsel filed a TAC continuing to name Uber as the sole defendant.

The TAC asserts causes of action for fraudulent concealment, negligence, and breach of the implied covenant of good faith and fair dealing. As an "alternative" cause of action "if and to the extent the trier of fact determines that [Uber] had no direct relationship with Rattagan and/or was not the

principal of the Dutch Entities liable for their acts," the TAC asserts a tort claim against Uber for aiding and abetting the Dutch subsidiaries' fraudulent concealment. Uber moved to dismiss the TAC. Applying California law, the district court granted the motion, ruling the negligence and implied covenant claims are time-barred. Rattagan no longer contests that ruling. The court also concluded the fraudulent concealment causes of action are foreclosed by the economic loss rule as interpreted in *Robinson*.

According to the court, *Robinson* provided only a narrow exception to the economic loss rule. It reasoned that *Robinson* excepted only fraud claims based on *affirmative misrepresentations* and only when the tortious conduct exposed a plaintiff to risk of liability for personal damages independent of the plaintiff's economic losses. The court concluded the exception does not apply here because Rattagan alleged only economic losses and did not allege Uber made any affirmative misrepresentations, as opposed to concealing information. While Rattagan claimed the alleged tortious conduct was independent of any contractual breach, the court found that his "complaint tells a different story." Rattagan asserted a separate cause of action for breach of the implied covenant of good faith and fair dealing, alleging Uber breached "a duty to disclose all facts known to [Uber] that were material to both Rattagan's legal representation and his role as legal representative of the [Dutch subsidiaries]" and that duty was "[b]ased on the direct attorney-client relationship between [Uber] and Rattagan." Likewise, he alleged the Dutch subsidiaries breached their "duty of disclosure to Rattagan," which existed "[b]ecause of the Dutch [subsidiaries'] confidential attorney-client relationship." The court determined "[t]hese allegations are squarely

inconsistent with his now-raised assertion that Uber [] breached a duty that was 'independent of the contract.' [Citation.]"

Rattagan appealed to the Ninth Circuit, which certified a question of state law expressly left open in *Robinson*. (*Rattagan v. Uber Technologies, Inc.* (9th Cir. 2021) 19 F.4th 1188; Cal. Rules of Court, rule 8.548(b)(2).) On February 9, 2022, we granted the certification request.

## II. DISCUSSION

To address the certified question, it is necessary to revisit in some detail the origins and evolution of California's economic loss rule as well as a broader set of cases exploring the dividing line between tort and contract law of which our economic loss rule precedents are a part. This backdrop leads to our holding here that an independent fraudulent *concealment* tort may arise during an ongoing contractual relationship.

### A. *Economic Loss Rule and Independent Tort Principles*

The economic loss rule is a device, among others, that courts have developed to address and protect the often elusive boundary line between tort and contract law.[3]

---

[3] The economic loss rule most generally applies to suits between the parties to a contract. But as observed in *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 922 (*Sheen*), a version of the doctrine may also apply in cases involving parties not in contractual privity, such as when a plaintiff seeks to impose " ' "liability in an indeterminate amount for an indeterminate time to an indeterminate class." ' " (*Id.* at p. 922, quoting *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 414; *Ultramares Corp. v. Touche* (1931) 255 N.Y. 170 [174 N.E. 441, 444].) But this case, like *Sheen*, falls into the more

"Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.' " (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 (*Foley*), citing Prosser, Law of Torts (4th ed. 1971) p. 613.) In contrasting contract and tort law, the court in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 (*Applied Equipment*) observed: " 'The law imposes the obligation that "every person is bound without contract to abstain from injuring the person or property of another, or infringing upon any of his rights." (Sec. 1708, Civ. Code.) This duty is independent of the contract . . . . "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' " (*Id.* at p. 514, quoting *Jones v. Kelly* (1927) 208 Cal. 251, 255.)

As a result of this distinction between contract and tort claims, parties injured solely by a contractual breach have a narrower set of remedies compared to those available to litigants who suffered tortious injury. "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial

---

traditional "contractual economic loss rule" category of cases. (*Sheen*, at p. 923.)

risks of their enterprise." (*Applied Equipment, supra,* 7 Cal.4th at p. 515, citing Civ. Code, § 3300.)

Civil Code section 3333 further provides: "For the breach of an obligation *not* arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for *all* the detriment proximately caused thereby, *whether it could have been anticipated or not.*" (Italics added.) Thus, emotional distress damages are awarded under appropriate circumstances in tort actions but generally are not available in contract actions. (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 105−106 (*Freeman & Mills*); *Applied Equipment, supra*, 7 Cal.4th at p. 516.) Additionally, exemplary or punitive damages may be awarded in a tort action if by clear and convincing evidence the tortfeasor is shown to have acted with "oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) But "punitive damages ' "are never recoverable for breach of contract, no matter how willful or malicious, except where the wrongful act is also a tort." ' " (*Harris v. Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 77 (*Harris*), quoting *Quigley v. Pet, Inc.* (1984) 162 Cal.App.3d 877, 887.)

Given the tension created by the policy of assuring predictability in contractual relations and the expansive scope of potential tort recovery, the economic loss rule was developed to ensure that the law of contract would not "drown in a sea of tort." (*East River S.S. Corp. v. Transamerica Delaval, Inc.* (1986) 476 U.S. 858, 866.) "The rule itself is deceptively easy to state: In general, there is no recovery in tort for *negligently* inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." (*Sheen, supra,* 12 Cal.5th at p. 922, italics added.) Or, as *Robinson* phrased the

rule: "[t]he economic loss rule requires a [contractual party] to recover in contract for purely economic loss due to disappointed expectations, unless [the party] can demonstrate harm above and beyond a broken contractual promise." (*Robinson*, *supra*, 34 Cal.4th at p. 988.)

As we explain in greater detail below, under the economic loss rule, tort recovery for breach of a contract duty is generally barred (but see generally, fns. 3 & 5 at pp. 10–11, *ante*, & 17, *post*) unless two conditions are satisfied. A plaintiff must first demonstrate the defendant's injury-causing conduct violated a duty that is independent of the duties and rights assumed by the parties when they entered the contract. Second, the defendant's conduct must have caused injury to persons or property that was not reasonably contemplated by the parties when the contract was formed. A review of the cases in which the doctrine has evolved provides context.

The doctrine first emerged in *Seely v. White Motor Co.* (1965) 63 Cal.2d 9 (*Seely*). A buyer sued in contract alleging the manufacturer breached an express contractual warranty of fitness by selling a defective truck. He sought contract damages for the money he paid for the truck, and for the profits he lost when he could not use the truck in his hauling business.[4] (*Seely*, at p. 13.) The buyer also sought strict liability damages in tort. After the buyer prevailed on the warranty claim, both parties appealed. The court upheld the contract damages, noting the manufacturer had furnished an express warranty in the contract. Its agent repeatedly accepted responsibility for, and

---

[4] The buyer initially sued both the manufacturer and the dealer, but ultimately proceeded at trial only against the manufacturer.

attempted to fix the defect, leading the buyer to reasonably rely on the warranty to resolve the issue. (*Ibid.*) The manufacturer was thus liable in contract for failing to deliver a truck that was "free from defects . . . under normal use," and for failing to correct the defect as promised. (*Ibid.*) "Without an agreement, defined by practice or otherwise, defendant should not be liable for these commercial losses." (*Id.* at p. 17.) The court upheld a damages award for both the amount paid for the truck and the loss of profits suffered by the buyer when he could not use the defective truck. It rejected buyer's claim that he was entitled to broader tort damages under a theory of strict liability.

The buyer argued that he was entitled to the additional damages because the evolution of the law regarding strict tort liability had supplanted the law regulating commercial sales. The court rejected that assertion, pointing out that: "The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries." (*Seely, supra,* 63 Cal.2d at p. 15.) "Final recognition that 'The remedies of injured consumers ought not be made to depend on the intricacies of the law of sales' [citations] caused this court to abandon the fiction of warranty in favor of strict liability in tort." (*Ibid.*, quoting *Ketterer v. Armour & Co.* (S.D.N.Y. 1912) 200 F. 322, 323.)

But the *Seely* court was careful to say that, just because a warranty analysis proved unserviceable in the area of personal injury, did "not mean that it has no function at all." (*Seely, supra,* 63 Cal.2d at p. 15.) There was no need to completely

jettison the law of warranty which " 'grew as a branch of the law[s] of commercial transactions and was primarily aimed at controlling the commercial aspects of these transactions.' " (*Id.* at p. 16, quoting James, *Products Liability* (1959) 34 Tex.L.Rev. 192; Llewellyn, *On Warranty of Quality, and Society* (1936) 36 Colum.L.Rev. 699, 37 Colum.L.Rev. 341.) Warranty rules regulate the quality of the product bargained for and insulate a manufacturer from liability of "unknown and unlimited scope" that may arise when its product fails to meet a customer's needs but causes no physical injuries. (*Ibid.*)

The court determined that tort recovery was unavailable because the defect did not cause any personal injury or damage to property other than to the truck itself. Chief Justice Traynor wrote: "The distinction that the law has drawn[,] between tort recovery for physical injuries and warranty recovery for economic loss[,] is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the *nature of the responsibility* a manufacturer must undertake in distributing his products. He can appropriately be held liable [in tort] for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create *unreasonable risks of harm.* He cannot be held [liable in contract] for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." (*Id.* at p. 18, italics added.) In other words, because tort recovery for strict product liability is limited to "physical harm to person or property" and plaintiff did not suffer such harm, his remedies were restricted to those contractually enforceable under warranty law. (*Ibid.*)

Later cases expanded the economic loss rule to circumstances beyond commercial warranty, extending it to limit recovery in other contractual situations. *Aas v. Superior Court* (2000) 24 Cal.4th 627, 636, 640 (*Aas*) applied the rule to bar homeowner claims in tort for diminution of home value due to multiple negligent construction defects that did not otherwise cause physical injury or property damage. The *Aas* court rejected the contention that *Seely* "was concerned exclusively with commercial losses or lost business profits, rather than economic losses in a broader sense." (*Aas,* at p. 642.) It concluded that *Seely* relied on the rule to honor the "fundamental difference between, on the one hand, the consumer's contractual interest in having a product of the expected, bargained-for value and quality, and, on the other hand, the consumer's tort interest in not suffering property damage or personal injury due to negligence in the manufacturing process." (*Ibid.*) Thus, the doctrine limits a plaintiff to economic losses, which are generally understood to include "pecuniary damage not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property." (Rest.3d Torts, Liability for Economic Harm (June 2020) § 2.)

Consistent with the understanding that "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations" (*Aas*, *supra*, 24 Cal.4th at p. 643), courts have gone on to apply the economic loss rule in a broad range of contractual situations. The rule operates to bar tort claims that might otherwise "disrupt the parties' private ordering, render contracts less reliable as a means of organizing commercial relationships, and stifle the development of contract law." (*Sheen, supra,* 12 Cal.5th at p. 915.) But the economic loss

rule does not act as an *absolute* bar to tort recovery in every case in which the parties have a contractual relationship. Courts generally permit tort suits if the defendant allegedly violated a duty rooted in tort principles that is independent of the parties' contractual rights and obligations and exposed the plaintiff to a risk of harm beyond the parties' reasonable contemplation when they entered into the contract.[5] The ability to recover for an independent tort is a fundamental principle that our courts have broadly applied even where the economic loss rule is not directly implicated. To illustrate, the next three cases discuss the application of this "independent tort principle" to factual patterns involving claims of *intentionally* tortious conduct.

In *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 (*Tameny*), the plaintiff was an at-will employee of defendant employer. He sued for wrongful termination alleging that he was fired for refusing to engage in illegal price fixing. He sought punitive and treble damages in tort. Defendant demurred. It conceded that, if the allegations in the complaint were proven, the discharge would be illegal. However, it urged that plaintiff's recovery was limited to contract damages. The trial court

---

[5] The court has also recognized a breach of contract may sound in tort even when the claim arises from, and is not independent of, the underlying contract if it is within the context of a "special relationship," such as between an insurance company and an insured during the claim handling process, or between a lawyer and a client for malpractice in the provision of professional legal services. (*Sheen, supra*, 12 Cal.5th at p. 929, citing *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 923; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180–181.) The Ninth Circuit has indicated that Rattagan forfeited any argument that a special relationship exception applies here (*Rattagan, supra,* 19 F.4th at p. 1190) and Rattagan has disavowed any reliance on it.

agreed and granted demurrer on the tort claims. The *Tameny* court reversed. It concluded employer's firing did not breach its duty to plaintiff under the express or implied terms of the employment contract. Instead, defendant violated a separate tort duty. The tort duty was imposed, not by the contract, but by law in order to promote the fundamental public policy contained in the penal law to discourage price fixing. (*Id.* at p. 176, see also *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 74 [extending *Tameny* claims to terminations violative of any fundamental public policy rooted in a statutory or constitutional provision].) Because the duty not to fire an employee for refusing to commit a crime is a basic social policy imposed by law on all employers, the plaintiff was permitted to recover in tort.

The court rejected the employer's argument that, because of the contractual nature of the relationship, any injury inflicted during that relationship "gives rise only to a breach of contract action." (*Tameny, supra*, 27 Cal.3d at p. 174.) "California decisions . . . have long recognized that a wrongful act committed in the course of a contractual relationship may afford both tort and contractual relief, and in such circumstances the existence of the contractual relationship will not bar the injured party from pursuing redress in tort." (*Id.* at pp. 174–175.) The court characterized an independent tort action arising during contractual relationship as " ' "ex delicto" ' " or " ' "aris[ing] from a breach of *duty growing out of the contract*" ' " (italics omitted) as opposed to an " ' "ex contractu" ' " cause of action that " ' "arises from a breach of *a promise set forth in the contract*" ' "(italics added). (*Id.* at p. 175.) In other words, the simple existence of a contractual relationship between two parties does not mean one party can tortiously injure the other

but limit its liability to a contract remedy. If a party breaches a contractual duty but also commits an independent tort, the injured party may recover under both theories. Thus, regardless of whether the employer had a contractual right to fire Tameny for any or no cause, the existence of an employment agreement offered the employer no refuge. The tort claim arose independently of the contract because "an employer's obligation to refrain from discharging an employee who refuses to commit a criminal act does not depend upon any express or implied ' "promises set forth in the [employment] contract." ' " (*Id.* at p. 176, quoting *Eads v. Marks* (1952) 39 Cal.2d 807, 811.) The parties did not contemplate, nor could they allocate, the risk of harm flowing from the employer's demand, or Tameny's refusal, to violate the law under a threat of discharge. The damages flowed from the breach of an independent tort duty " 'based primarily upon social policy, and not necessarily upon the will or intention of the parties . . . .' " (*Ibid.*, quoting Prosser, Law of Torts (4th ed. 1971) p. 613.)

*Applied Equipment* provides an example of how the same legal principle may be applied to *bar* tort remedies for conduct arising in the course of a contractual relationship. The issue was whether one party could sue the other in tort for conspiring with outsiders to breach the parties' contract. The court observed that conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. (*Applied Equipment*, *supra*, 7 Cal.4th at p. 515.) It held that "consistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a

contract does not lie against a party to the contract." (*Id.* at p. 514.) As the court explained, "Whether or not a stranger to the contract induces its breach, the essential character of a contracting party's conduct remains the same — an unjustified failure or refusal to perform. In economic terms, the impact is identical — plaintiff has lost the benefit of a bargain and is entitled to recover compensation in the form of contract damages. In ethical terms, the mere entry of a stranger onto the scene does not render the contracting party's breach more socially or morally reprehensible. A party may breach a contract without any third party inducement because of personal, racial, or ethnic animus, or for other nefarious or unethical reasons. In contrast, a breach may be the product of naive or innocent misunderstanding or misperception created by the aggressive solicitation of an outsider. In any case, motivation is irrelevant. Regardless of the presence or absence of third party involvement, the contracting party has done nothing more socially opprobrious than to fall short in meeting a contractual commitment. Only contract damages are due." (*Id.* at pp. 516–517.)

Similarly, in *Freeman & Mills,* we applied the independent tort principle to overrule *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of California* (1984) 36 Cal.3d 752. (*Freeman & Mills*, *supra*, 11 Cal.4th at p. 103.) A decade earlier, *Seaman's* had recognized a new cause of action for tortious bad faith denial of the existence of a contract based on the view that such conduct so "offends accepted notions of business ethics" that tort remedies were appropriate. (*Seaman's*, at p. 770.) The *Freeman* court repudiated the *Seaman's* holding and reaffirmed the general rule that, outside the area of insurance contracts, tort recovery is not available for

a contract breach unless " 'an independent duty arising from principles of tort law' " is violated. (*Freeman & Mills*, at p. 102.) In doing so, the court noted "[i]t seems anomalous to characterize as 'tortious' the bad faith denial of the existence of a contract, while treating as 'contractual' the bad faith denial of liability or responsibility under an acknowledged contract. In both cases, the breaching party has acted in bad faith and, accordingly, has presumably committed acts offensive to 'accepted notions of business ethics.' (*Seaman's*, . . . at p. 770.) Yet to include bad faith denials of liability within *Seaman's* scope could potentially convert every contract breach into a tort. Nor would limiting *Seaman's* tort to incidents involving 'stonewalling' adequately narrow its potential scope. Such conduct by the breaching party, essentially telling the promisee, 'See you in court,' could incidentally accompany *every* breach of contract." (*Id.* at p. 103.)

The economic loss rule is best understood as a specific application of the same independent tort principle reflected in *Tameny*, *Applied Equipment,* and *Freeman & Mills*. Whenever a contract breach causes physical harm to a person or property, the economic loss rule's limitation gives way to the recognition that an independent tort duty of care was likely also breached, resulting in an injury not contemplated and provided for by the parties. This is so because any contractual breach resulting in physical injury or property damage normally resides outside the reasonable expectations of the parties when they entered their contractual relationship.[6] The inverse may also be true. When

---

[6] There are, of course, some contractual relationships in which certain risks of injury can be demonstrated to have been

a contractual breach results only in economic losses, the pecuniary injury may fall within the scope of parties' precontractual expectations and their allocation of risks, and it is less likely to implicate the breach of a tort duty independent of their contractual rights and obligations. Whether the alleged harm arises independently from the contract can be a nuanced question.

When evaluating whether the parties' expectations and risk allocations bar tort recovery, the court must consider the alleged facts. First, applying standard contract principles, it must ascertain the full scope of the parties' contractual agreement, including the rights created or reserved, the obligations assumed or declined, and the provided remedies for breach. Second, it must determine whether there is an independent tort duty to refrain from the alleged conduct. Third, if an independent duty exists, the court must consider whether the plaintiff can establish all elements of the tort

---

contemplated and accounted for by the parties. For instance, disabling injuries caused by an employment termination "are generally within the coverage of workers' compensation and subject to the exclusive remedy provisions, unless the discharge comes within an express or implied statutory exception or the discharge results from *risks reasonably deemed not to be within the compensation bargain*." (*Shoemaker v. Meyers* (1990) 52 Cal.3d 1, 7, italics added.) In *Hunter v. Up-Right, Inc.* (1993) 6 Cal.4th 1174 (*Hunter*), which is discussed further *post*, the court relied, in part, on *Shoemaker* to answer an analogous question: "whether the breach of what we have recognized as an essentially contractual relation can . . . support tort recovery for fraud and deceit — in order to deter fraudulent conduct by employers . . . or to advance some other policy goal." (*Id*. at pp. 1183–1184.)

independently of the rights and duties assumed by the parties under the contract.[7]

The guiding and distinguishing principle is this. If the alleged breach is based on a failure to perform as the contract provides, and the parties reasonably anticipated and allocated the risks associated with the breach, the cause of action will generally sound only in contract because a breach deprives an injured party of a benefit it bargained for. However, if the contract reveals the consequences were not reasonably contemplated when the contract was entered and the duty to

---

[7]    An important part of this inquiry is determining whether the aggrieved party was exposed to a risk of harm beyond the reasonable contemplation of the parties when they entered into the contract. An unanticipated harm may result from the breach of an independent tort duty. If, however, the harm was anticipated and the risk allocated, the conduct causing it would not support an independent tort claim. It may, nevertheless, constitute a breach of either an explicit term or of the covenant of good faith and fair dealing implied in every contract. To review, the implied covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349.) "The essence of the good faith covenant is objectively reasonable conduct." (*Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 141; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 796; 1 Witkin, Summary of Cal. Law (11th ed. 2024) Contracts, § 825, p. 881.) "An allegation of breach of the implied covenant of good faith and fair dealing is an allegation of breach of an 'ex contractu' obligation, namely one arising out of the contract itself. The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Foley, supra,* 47 Cal.3d at p. 690.)

avoid causing such a harm has an independent statutory or public policy basis, exclusive of the contract, tort liability may lie.

Our recent analysis in *Sheen* provides a useful example of how the economic loss rule applies beyond a warranty context. Wells Fargo Bank N.A. (Wells Fargo or the bank) agreed to fund two loans (junior loans) to Sheen, who used his home, secured by a first loan mortgage, as collateral. (*Sheen*, *supra*, 12 Cal.5th at p. 914.) When Sheen fell behind in payments on the junior loans, the bank recorded notices of default and scheduled a foreclosure sale. (*Id*. at p. 916.) Sheen applied for loan modifications and the bank cancelled the foreclosure sale date. (*Id*. at p. 917.) It did not act on the loan modification requests, however, but did send Sheen letters noting the "severe delinquency" of his loan accounts. (*Ibid*.) The letters notified Sheen that the entire balance of the accounts had been accelerated, rendering them due and owing; that the loan accelerations had been reported to the applicable agencies; and that the bank would "proceed with whatever action is deemed necessary to protect our interests." (*Ibid*.)

Wells Fargo ultimately sold the loans to another entity which foreclosed on the home. Sheen sued Wells Fargo for negligence, among other claims, alleging the bank had not rejected his modification request; that he believed the loans had been modified to unsecured loans; and his home "would never be sold at a foreclosure auction." (*Sheen*, *supra*, 12 Cal.5th at pp. 914−915, 917.) As a result, the bank's actions caused him to "forgo alternatives to foreclosure." (*Id*. at p. 915.) He alleged the bank was liable in tort for the value of the house; hotel, and storage costs incurred after the foreclosure; and resulting damage to his credit rating. (*Ibid*.) Wells Fargo demurred,

asserting it did not owe the duty of care on which Sheen relied. (*Ibid*.) The Court of Appeal affirmed the trial court's order sustaining the demurrer but noted that " '[t]he issue of whether a tort duty exists for mortgage modification has divided California courts for years.' " (*Ibid*.)

Sheen sought review in this court and urged that, as a matter of law, when a borrower submits a loan modification application, the lender is liable in tort for its failure to process and respond to that application. But no language in the contract required the lender to review or respond to Sheen's modification application, so the duty on which Sheen relied was not "ex contractu." Rejecting Sheen's argument that the bank breached an extracontractual or "ex delicto" obligation, we noted that " '[d]uty is not universal; not every defendant owes every plaintiff a duty of care. A duty exists only if " 'the plaintiff's interests are entitled to legal protection against the defendant's conduct.' " [Citation.] Whether a duty exists is a question of law to be resolved by the court.' [Citation.] 'A duty of care may arise through statute' or by operation of the common law. [Citation.]" (*Id*. at p. 920.)

*Sheen* began by determining that no federal or state statute or regulation imposed a duty on Wells Fargo to avoid purely economic losses related to processing Sheen's modification application. (*Sheen, supra,* 12 Cal.5th at pp. 920−922.) The court concluded the economic loss rule doomed Sheen's tortious negligence cause of action because "it is based on an asserted duty that is contrary to the rights and obligations clearly expressed in the loan contract." (*Id*. at p. 925.) The mortgage was secured through a deed of trust. Under the contract, Wells Fargo had the right to foreclose and sell the property to satisfy the debt if Sheen failed to make payments on

the loan. Imposing an extracontractual duty of care on the lender to process, review, and respond to the loan modification applications *before* it was permitted to foreclose on the property, as the contract provided, "would go further than creating obligations unnegotiated or agreed to by the parties; it would dictate terms that are *contrary* to the parties' allocation of rights and responsibilities." (*Ibid.*) Thus, to the extent any independent duty of care could support a negligence claim under the common law, it was barred because Sheen sought relief for economic losses only and the tort duty he urged the court to recognize was in conflict with the terms of the mortgage contract between the parties. (*Id.* at pp. 943−944.) The terms of the contract demonstrated that Sheen and the bank had anticipated the possibility that the loans would not be repaid and specifically provided what remedies would be available in that eventuality.

The court also determined there is no compelling public policy basis for recognizing Sheen's proposed duty of care because denying the negligence claim under the economic loss rule did not foreclose alternate avenues of relief to "borrowers who suffer injury due to missteps by a lender (or loan servicer) in connection with the handling of a mortgage modification application." (*Sheen, supra*, 12 Cal.5th at p. 943.) For instance, in appropriate circumstances, a borrower may be permitted to assert causes of action for negligent misrepresentation and promissory fraud.[8]

---

[8] Additionally, the court also declined to apply the multifactor test outlined in *Biakanja v. Irving* (1958) 49 Cal.2d 647 for imposing tort liability when a contractual breach causes

We concluded Wells Fargo had no tort duty, under general negligence principles, to process Sheen's modification applications in a manner that would make it liable for Sheen's economic losses. (*Sheen*, *supra*, 12 Cal.5th at p. 948.) Instead, the claim was based on the mortgage contract and fell within the economic loss rule. We reasoned that imposing liability on the lender would "disrupt the parties' private ordering, render contracts less reliable as a means of organizing commercial relationships, and stifle the development of contract law." (*Id.* at p. 915.) We recognized the Legislature is free to impose, as a matter of policy, the duty Sheen claimed by balancing the interests served by the economic loss rule against other competing social costs and benefits.

*Sheen* cited one scholar's explanation of the rule: " 'Using contract law to govern commercial transactions lets parties and their lawyers know where they stand and what they can expect to follow legally from the words they have written. But if a disappointed buyer has the option of abandoning the contract and suing in tort, the significance of the contract is diminished and the doctrines that protect the integrity of the contractual process are reduced in importance. Parties wrangle over integration clauses to make clear that their obligations are the ones stated in the contract and nothing else; the point of bothering about such matters becomes unclear if a disappointed party can later invoke an outside set of obligations that are imposed on the promisor and defined by the law of tort.' "

---

injury to a third party not in privity with the defendant. (*Sheen*, *supra*, 12 Cal.5th at pp. 936−942.) *Biakanja* is inapplicable here given that the parties were in privity.

(*Sheen*, *supra*, 12 Cal.5th at p. 923, quoting Farnsworth, *The Economic Loss Rule* (2016) 50 Val.U. L.Rev. 545, 553–554.)

We also explained: "According to the Restatement [of Torts], the [economic loss rule] . . . 'serves several purposes.' [Citation.] For one, it 'protects the bargain the parties have made against disruption by a tort suit.' [Citation.] For another, 'the rule allows parties to make dependable allocations of financial risk without fear that tort law will be used to undo them later.' [Citation.] 'Viewed in the long run,' therefore, 'the rule prevents the erosion of contract doctrines by the use of tort law to work around them.' " (*Sheen*, at p. 923, quoting Rest.3d Torts, Liability for Economic Harm (June 2020) § 3, com. b., pp. 12–13.)

## B. Robinson *Majority Opinion*

With these principles in mind, we turn to *Robinson*, which presented the court with its first opportunity to address whether, and to what extent, the economic loss rule applies to an *intentional* tort, specifically fraudulent misrepresentation in the performance of a contract.

Robinson made helicopters and used sprag clutches supplied under contract by Dana Corp. (Dana). Sprag clutches are a safety mechanism allowing pilots to maintain control of a helicopter in the event of a power failure. (*Robinson*, *supra*, 34 Cal.4th at p. 985.) Before producing an aircraft, manufacturers like Robinson were required to obtain approval of a "type certificate" from the Federal Aviation Administration (FAA), which essentially froze an aircraft's design in place. (*Ibid.*) The aircraft had to be produced in exact accordance with those specifications unless modifications were approved by the FAA. (*Ibid.*) The type certificate for Robinson's R22 and R44 model

helicopters required sprag clutches to be ground at a particular level of hardness. (*Ibid*.) For nearly 12 years, Dana supplied compliant clutches with a failure rate of 0.03 percent. (*Id*. at pp. 985−986.)

At some point, Dana changed its grinding process which produced clutches with a higher level of hardness, but Dana did not notify either Robinson or the FAA of the change.[9] (*Robinson*, *supra*, 34 Cal.4th at p. 986.) With each delivery of noncompliant clutches over the ensuing 15-month period, Dana included a written certificate stating the parts had been manufactured in conformance with federally approved specifications, which was untrue. (*Ibid*.) Robinson did not learn it had unwittingly accepted the noncompliant clutches until after Dana reverted to the original grinding process. (*Ibid*.) By then, Robinson was experiencing a 9.86 percent failure rate attributable to the noncompliant clutches. (*Ibid*.) The broken clutches did not cause any personal injuries or additional property damage beyond the broken clutches themselves. (*Ibid*.)

Upon learning of the defect, the FAA and its British agency equivalent required Robinson to recall and replace all the faulty clutches. (*Robinson*, *supra*, 34 Cal.4th at p. 986.) Robinson repeatedly demanded Dana provide a list of the serial and lot numbers for the noncompliant clutches. The first list Dana provided included only the lot numbers and hardness levels for the clutches but not the serial numbers. A jury later found Dana had intentionally redacted the serial numbers from

---

[9]     Robinson did not claim Dana had any fraudulent intent when it changed its grinding standard. (*Robinson*, *supra*, 34 Cal.4th at p. 986, fn. 3 (maj. opn. of Brown, J.); *Id*. at p. 994 (dis. opn. of Werdegar, J.).)

the list it provided. (*Id*. at p. 987, fn. 4.) Dana did not disclose the serial numbers until several months later. (*Id*. at p. 987.) Dana also refused to replace the clutches because it disputed causation, contending the higher failure rate was due not to the change in its grinding process, but to Robinson's inadequate design. (*Ibid*.)

Robinson sued. The jury returned a verdict for Robinson, finding Dana breached its contract and warranties, and had "(1) made false representations of material fact, (2) knowingly misrepresented or concealed material facts with intent to defraud, (3) and by clear and convincing evidence was guilty of oppression, fraud, or malice in its intentional misrepresentations and concealments." (*Robinson, supra*, 34 Cal.4th at pp. 987, 990.) Robinson was awarded over $1.5 million compensatory contract damages for the cost of replacement parts and wages for the employee time spent identifying and replacing the defective clutches. (*Id*. at p. 987.) Robinson also was awarded $6 million in punitive damages. (*Ibid*.) The Court of Appeal affirmed the contract damages but reversed judgment on the fraud claims and punitive damages award, finding Robinson could not recover in tort because it had suffered only economic losses. (*Id*. at p. 988.) We reversed.

After reviewing the history of the economic loss rule in the context of strict liability and negligence actions (*Robinson, supra*, 34 Cal.4th at pp. 988–989), the majority set out a nonexhaustive list of instances in which courts had permitted tort damages in contract cases, including " 'where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently

induced. [Citation.]' " (*Id.* at pp. 989–990, quoting *Erlich v. Menezes* (1999) 21 Cal.4th 543, 551–552 (*Erlich*).) The court observed, "With respect to situations outside of those set forth above . . . ' "a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." [Citation.] Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. [Citation.] If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies.' " (*Robinson*, at p. 990, quoting *Erlich*, at pp. 553–554.)[10]

Turning to Robinson's intentional fraud claims, the majority relied only on the *affirmative misrepresentations* Dana

---

[10] The general rule is "[t]he law eschews inquiry into a breaching party's motives; whether acting in good faith or bad faith, a party that breaches a commercial contract must pay only contract damages." (*Applied Equipment, supra*, 7 Cal.4th at p. 516; *Foley, supra*, 47 Cal.3d at p. 699; *Harris, supra*, 14 Cal.App.4th at 82.) This principle ensures economic certainty in contractual relationships while preventing a breaching party from avoiding liability for economic losses caused by its breach simply by asserting it did not mean to do so. Critically, *Erlich* involved a defendant found liable for breaching the parties' contract and negligently causing economic losses, but not liable for engaging in an independent fraudulent, and therefore intentionally tortious, act.

made in the false certificates it provided with the noncompliant clutches. It held these affirmative misrepresentations were "dispositive fraudulent conduct related to the performance of the contract." (*Robinson*, *supra*, 34 Cal.4th at p. 991.) It expressly declined to address whether Dana engaged in acts of *fraudulent concealment* by the redaction and withholding of serial numbers independent of its contractual breach. (*Robinson*, at p. 990.) Based on the record, the court concluded Robinson unquestionably established all the required elements for a fraudulent misrepresentation by proving Dana knowingly furnished the false certificates. That deceptive conduct was independent of the contractual breach Dana committed when it delivered the noncompliant clutches. In other words, Dana's conduct was more than a mere contract breach based on its delivery of the parts. Dana not only knew it was delivering nonconforming parts, it took the additional step of intentionally deceiving Robinson into believing it was delivering parts that satisfied its contractual obligation. The act of deception could not be said to have violated a duty "arising from the contract." Instead, it established the commission of an independent fraud and supported an award of tort damages.

Dana was aware its grinding method rendered its parts noncompliant but delivered them anyway. That action was an intentional breach, followed by a separate intentional act of fraudulently claiming the parts did comply with the contract. However, even if Dana had been initially *unaware* that its grinding method produced noncompliant parts, it could still have been liable in tort if, subsequent to delivery, it learned of the impact of the grinding change, understood it posed a risk of serious harm to the public and possible government penalties for Robinson, knew Robinson was unaware of this information,

and continued to falsely certify, or otherwise maintain the parts were compliant. (See further discussion at p. 50, fn. 13, *post*.)

" 'The elements of fraud . . . are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*), quoting 5 Witkin, Summary of Cal. Law (9th ed. 1988), § 676, p. 778.) But for Dana's affirmative misrepresentations in the false certificates, "Robinson would not have accepted delivery and used the nonconforming clutches over the course of several years, nor would it have incurred the cost of investigating the cause of the faulty clutches. Accordingly, Dana's tortious conduct was separate from the breach itself, which involved Dana's provision of the nonconforming clutches. In addition, Dana's provision of faulty clutches exposed Robinson to liability for personal damages if a helicopter crashed and to disciplinary action by the FAA. Thus, Dana's fraud is a tort independent of the breach." (*Robinson, supra*, 34 Cal.4th at p. 990.) Dana was liable in tort, not because it breached the contract by providing the faulty clutches, but because it lied when it represented the clutches met the contract specifications.

Dana argued the economic loss rule should be applied to "promote[] predictability in contracts in commercial transactions," contending that Robinson's fraud claims were "simply part of the alleged breach of contract." (*Robinson, supra*, 34 Cal.4th at p. 992.) The majority disagreed. "A breach of contract remedy assumes that the parties to a contract can negotiate the risk of loss occasioned by a breach . . . No rational party would enter into a contract anticipating that they are or

will be lied to. 'While parties, perhaps because of their technical experience and sophistication, can be presumed to understand and allocate the risks relating to negligent product design or manufacture, those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction.' " (*Id.* at pp. 992−993, quoting Tourek et al., *Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation* (1999) 84 Iowa L.Rev. 875, 909.)

California public policy supported the holding because fraud is considered such a "deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce.' " (*Erlich*, *supra*, 21 Cal.4th at 554.) Quoting *Lazar*, *supra*, 12 Cal.4th at page 646, the majority emphasized that, " '[i]n pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. [Citation.] Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for "predictability about the cost of contractual relationships" [citation], fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the bargain damages.' " (*Robinson*, *supra*, 34 Cal.4th at p. 992.)

The majority disagreed with Dana's contention that its decision would open the "floodgates to future litigation" because the holding was narrowly confined to "affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." (*Robinson*, *supra*, 34 Cal.4th at p. 993.) Furthermore, the requirement that a fraud cause of action

must be pled with factual specificity provides an additional safeguard to ensure trial courts are well-positioned at the pleading stage to assess whether the tort claim is truly independent of the contract, rather than arising from it. (*Ibid*.)

It is inaccurate to conclude *Robinson* announced an *exception* to the economic loss rule. The more accurate understanding is that the case clarified the extent of the rule by demonstrating why the doctrine simply did not apply to the case at issue. Robinson suffered economic losses due to Dana's intentionally tortious conduct, not just those attributable to its breach of contract. While Robinson incurred only economic losses, it was also exposed to a risk of harm far beyond the disappointment of its expectancy interest in contract fulfillment. In this instance, the risk included potential liability for personal injury or property damage and disciplinary action by the FAA that may have resulted from a catastrophic failure of the defective clutches. In short, rather than apply the economic loss rule, *Robinson* applied the broader independent tort principle. An examination of the *Robinson* dissent sheds further light on the distinction between cases in which the economic loss doctrine applies and those, like *Robinson,* involving intentionally tortious conduct arising independently during a contract relationship.

## C. *The* Robinson *Dissent*

In dissent, Justice Werdegar urged a bright-line application of the economic loss rule to recognize tort liability only when a misrepresentation led to *actual* property damage or personal injury. (*Robinson*, *supra*, 34 Cal.4th at p. 998 (dis. opn. of Werdegar, J.).) Applying the rule in this way, she urged, would both punish and deter "opprobrious conduct." (*Ibid*.)

"[B]y excluding tort recovery in those cases, like this one, where the only damages are economic, [her approach] preserves the valuable distinction between tort and contract remedies and avoids the problems that would arise if every routine breach were susceptible to both tort and contract claims." (*Ibid.*) The majority disagreed. "While the bright-line rule the dissent advocates has the advantage of being clear and easily applied, it is worth noting that the rule's development in the context of product liability claims and its extension to claims for negligent breach of contract were not mere fortuities. Dealing with affirmative acts of fraud and misrepresentation raises different policy concerns than those raised by negligence or strict liability claims. [¶] . . . The economic loss rule is designed to limit liability in commercial activities that *negligently or inadvertently* go awry, not to reward malefactors who *affirmatively misrepresent and put people at risk*." (*Id.* at p. 991, fn. 7, italics added.)

The dissent also expressed concern the court's decision might "breathe[] new life into the heretofore moribund doctrine of bad faith denial of breach of contract." (*Robinson*, *supra*, 34 Cal.4th at 994 (dis. opn. of Werdegar, J.); see also *Freeman & Mills*, *supra*, 11 Cal.4th at p. 103.) The majority, however, declined to accept the dissent's characterization of Dana's false certificates as mere representations "that its parts satisfied the contract," and thus nothing more than a "refus[al] to admit that it was breaching the contract while in fact it was doing so." (*Robinson*, at p. 994.) The majority recognized the principle that "[t]he law eschews inquiry into a breaching party's motives; whether acting in good faith or bad faith, a party that breaches a commercial contract must pay only contract damages." (*Id.* at p. 995, citing *Applied Equipment*, *supra*, 7 Cal.4th at p. 516;

*Foley*, *supra*, 47 Cal.3d at p. 699; *Harris*, *supra*, 14 Cal.App.4th at 82.) "This rule applies even when the breach is accomplished in a fraudulent manner." (*Robinson*, at p. 995, citing *Hunter*, *supra*, 6 Cal.4th 1174.)

The majority explained that the flaw in the dissent's argument rested in its conflation of two separate threads of its analysis. The majority did not inquire into Dana's motive *for breaching the contract*. It observed that Robinson never claimed Dana acted with fraudulent intent when it changed its grinding standard. (*Robinson*, *supra*, 34 Cal.4th at p. 986, fn. 3.) The majority's tort analysis focused instead on factual misrepresentations Dana made in its conformance certificates. Beyond a contract breach for delivering noncompliant parts, Dana knowingly mispresented that the clutches complied with FAA specifications and intentionally induced Robinson to rely detrimentally on that representation. Dana's misrepresentations created a serious risk of injury to the wider public and potential governmental sanction. (*Id.* at pp. 990−991.) This intentionally tortious conduct stood apart from Dana's contractual breach.

Even if, as the dissent insisted, Dana was required under the terms of the purchase orders to provide conformance certificates with each shipment, it would go too far to say Dana was contractually compelled to knowingly provide false ones. " 'Simply put, a contract is not a license allowing one party to cheat or defraud the other.' " (*Robinson*, *supra*, 34 Cal.4th at p. 992, quoting *Grynberg v. Citation Oil & Gas Corp.* (1997) 1997 SD 121 [573 N.W.2d 493, 501].) Dana had a choice. It could have either provided truthful certificates or none at all, but it was not free to defraud Robinson by falsely claiming it was providing compliant clutches when it knew it was not, then hide

behind the legal principle that it was not obligated to admit it had breached the parties' contract. Had Dana simply failed to provide the certificates, Robinson had every right under the contract to demand them. If Dana still failed to comply, Robinson could have claimed a contractual breach based on the failure. In that case, the broader breach for delivering noncompliant clutches would likely have been discovered sooner, avoiding the danger of societal harm caused by Robinson's unknowing use of defective parts.

A brief examination of *Hunter*, relied upon by the dissent and cited by Uber in support of its arguments, is instructive. Properly viewed it is wholly consistent with *Robinson* as well as our holding here. In *Hunter*, an employee's supervisor falsely informed an employee that his position was to be eliminated and he would be terminated if he did not resign. (*Hunter*, *supra*, 6 Cal.4th at p. 1179.) Relying on the misrepresentation, Hunter resigned and later sued after he learned his job had not been eliminated. (*Ibid.*) A jury found in favor of Hunter on three causes of action: breach of implied contract not to terminate employment without good cause, breach of implied covenant of good faith and fair dealing, and fraud. (*Id.* at p. 1180.)

Upright did not challenge the jury's verdict on Hunter's contract theories, only his tortious fraud claim. We reversed judgment on his tort claim, observing the employer "simply employed a falsehood to do what it otherwise could have accomplished directly [i.e., by firing him in breach of the implied contract]. It cannot be said that [the employee] relied to his detriment on the misrepresentation in suffering constructive dismissal." (*Hunter*, *supra*, 6 Cal.4th at p. 1184.) In other words, the employee was unable to independently establish the elements of the fraud cause of action. Rather than inducing

detrimental reliance, the falsehood was "the means to the end desired by the employer, i.e., termination of employment." (*Id.* at p. 1185.) Furthermore, the result of the misrepresentation was "indistinguishable from an ordinary constructive wrongful termination" (*id.* at p. 1184), which involved the same harms one would have reasonably expected to suffer from a contractual breach.

By contrast in *Robinson*, Dana did not use its affirmative misrepresentations as a means of breaching its contract with Robinson. It did that when it shipped noncompliant parts. The affirmative misrepresentations were instead used for a different purpose, to induce Robinson to *accept* the parts, something Dana could not have accomplished independently without engaging in fraudulent conduct. Thus, as the court observed, nothing prevented Robinson from establishing the required elements of fraud independent of Dana's contractual breach. Additionally, Dana's tortious conduct exposed Robinson to potential liability for personal injuries and governmental disciplinary actions — something beyond the reasonable contemplation of the parties that might result from a breach when they entered into their contract.[11]

_____

[11] The parties debate whether the penultimate paragraph in *Robinson*, *supra*, 34 Cal.4th at page 993, conveys a requirement that plaintiffs must demonstrate the fraudulent conduct exposed them to the risk of personal injury liability, *in particular*, even if they can establish the elements of the cause of action independently. That specific liability risk as well as the threat of potential governmental disciplinary action to which Robinson was exposed are merely illustrative of the types of harm that *may* fall beyond the reasonable expectations of the parties when they entered into their contract. Under a factually

The lesson to be drawn from this review is that contract and tort obligations are different. (See, generally *Applied Equipment*, *supra*, 7 Cal.4th at pp. 515–518.) The "independent tort principle," and its specific application in our economic loss rule cases, honors those differences. The law of contracts protects the interests of parties who enter into an agreement that secures rights and obligations of their choosing. The parties make clear those rights and obligations by the terms they put in the contract. Contract law functions to facilitate commerce by enforcing the agreement the parties adopt. Tort law operates on a different principle. A tort remedy arises, not based on an agreement between the parties, but because the defendant has violated a societal duty that the law itself imposes on everyone. A tortfeasor is held liable not for violating a contract, but for violating an independent legal duty.

But to be held liable in tort, a defendant must commit a tort. If all the defendant has allegedly done is violate the terms of the parties' contract, depriving the plaintiff of the benefits the contract ensures, the defendant's liability is limited by the contract. Broader tort liability only arises if a defendant

distinct set of circumstances, the extracontractual, unanticipated harm caused by the intentionally tortious conduct might be quite different. Additionally, Rattagan has expressed some concern that this language from *Robinson* could be misconstrued as placing a bar on the types of recoverable damages available for an independent fraud claim. It does not. Our holding specifically stated that Robinson's "fraud and intentional misrepresentation claim . . . is an independent action based in tort," thus "the economic loss rule *does not bar tort recovery*." (*Id*. at p. 984, italics added.) Meaning, plaintiffs were entitled to recover tort damages permitted under the Civil Code according to proof and subject to the rule against double recovery. (See *Lazar*, *supra*, 12 Cal.4th at p. 649.)

violates an independent legal duty and the type of harm that ensues was not reasonably contemplated or accounted for by the contractual parties.

An examination of the parties' agreement and the reasonable expectations for which they provide is informed by an objective evaluation of the terms of the contract. Case law provides examples. In *Seely*, it was reasonable to conclude the parties envisioned the manufacturer might deliver a defective truck. The warranty guarded against that possibility by ensuring the manufacturer would deliver a serviceable truck and repair any defect. The parties could not have reasonably expected, however, that the manufacturer would be liable in strict liability for "*all* the detriment proximately caused" by the breach of the warranty whether "*anticipated or not.*" (See Civ. Code, § 3333, italics added.) In *Robinson,* the parties envisioned the supplier might deliver nonconforming parts. To ensure otherwise, the contract provided precisely the kind and quality of parts the manufacturer agreed to deliver. Objectively, the parties did not consider, or allocate the risk for, the manufacturer lying about the quality of the parts it did deliver, and thus, they could not have been reasonably expected to allocate the risks of harm that resulted when the manufacturer did so. In *Tameny*, the parties bargained for at-will employment. There was no indication, however, the employee reasonably could have envisioned the employer would demand that he break the law or would fire him for refusing to do so.

We now turn to the Ninth Circuit's certified question.

### D. *Fraudulent Concealment in the Performance of a Contract*

The Ninth Circuit asked: "Under California law, are claims for fraudulent concealment [as opposed to affirmative deception] exempted from the economic loss rule?" This is the question the majority left open in *Robinson.* The answer is yes because, as explained, the economic loss rule does not apply to limit recovery for intentional tort claims like fraud. The doctrine only applies to bar tort recovery for negligently inflicted economic losses unaccompanied by physical or property damage under the limits recognized in *Sheen.* (*Sheen, supra,* 12 Cal.5th at p. 922, *see,* discussion at pp. 21–28, *ante*.) This conclusion, however, does not provide the dispositive answer the Ninth Circuit has requested.

Therefore, we have reformed the question as follows (Cal. Rules of Court, rule 8.548(f)(5)): Can a plaintiff assert an independent claim of fraudulent concealment in the performance of a contract? The answer to this question is also yes. A plaintiff may assert a tort claim for fraudulent concealment based on conduct occurring in the course of a contractual relationship, if the elements of the cause of action can be established independently of the parties' contractual rights and obligations and the tortious conduct exposes the plaintiff to a risk of harm beyond the reasonable contemplation of the parties when they entered into the agreement.

Within the context of the broader independent tort principles previously summarized (see, discussion at pp. 22-24, *ante*), our answer encapsulates steps one and three of the required analysis: (1) a court must ascertain the full scope of the parties' contractual agreement; and (3) the court must determine whether the plaintiff can establish all elements of the

tort independent of the rights and duties assumed by the parties under the contract. Step two is satisfied here because, as discussed *post*, the independent tort duty to refrain from engaging in fraudulent conduct is well established by statute and common law.

As a threshold matter, it should be noted the district court granted Uber's motion to dismiss, in part, based on its misreading of *Robinson*. The district court understood *Robinson* to bar the assertion of a fraud claim based on concealment as opposed to affirmative deception, even when the tort arises independently of the parties' contract. But the *Robinson* majority expressly declined to decide that issue. (*Robinson*, *supra*, 34 Cal.4th at p. 990.) "It is axiomatic . . . that a decision does not stand for a proposition not considered by the court." (*People v. Harris* (1989) 47 Cal.3d 1047, 1071.)

California law has generally not treated fraud claims differently based on whether they allege affirmative deception or concealment. Thus, we see no principled reason to treat fraudulent concealment claims in the performance of a contract any differently from those based on affirmative misrepresentations, so long as a plaintiff can establish all the required elements of the cause of action independently of the parties' contractual rights and obligations and can demonstrate an exposure to risks of harm beyond those that would be reasonably expected as the result of a contractual breach. However, certain unique aspects of a claim of fraudulent concealment related to a contractual performance must be considered when making such a determination.

First, from a public policy perspective, California has long viewed fraud as being equally blameworthy whether

accomplished through affirmative misrepresentation or concealment. The Legislature enacted the general fraud statute in 1872, enshrining common law "fraudulent deceit" as a cause of action sounding in tort (Civ. Code, § 1709), while expressly defining acts of deceit as including "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ." (Civ. Code, § 1710, subd. (3).) At the same time, the Legislature included fraud among the grounds available for defeating claims of contractual consent (Civ. Code, § 1567, subd. (3)), and it defined "actual fraud" as including "[t]he suppression of that which is true, by one having knowledge or belief of the fact." (Civ. Code, § 1572, subd. (3).) Civil Code section 3294 was also enacted in 1872 to authorize exemplary damages to punish fraud, which it defined as ". . . an intentional misrepresentation, deceit, or *concealment of a material fact known to the defendant* with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Italics added.)

California case law similarly has viewed fraud by concealment on equal footing with fraud by affirmative misrepresentation. "Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent.' " (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 37, quoting 37 Am.Jur.2d, Fraud and Deceit, § 144.) "[I]ntentional concealment of a material fact is an alternative form of fraud and deceit equivalent to direct affirmative misrepresentation." (*Stevens v. Superior Court* (1986) 180 Cal.App.3d 605, 608−609.)

Thus, from a policy standpoint, there is no logical reason

to distinguish among various species of actionable fraud committed while otherwise performing a contract, assuming the tort elements can be established independently of the contractual rights and obligations that each party voluntarily assumed at the outset of the relationship. If that is the case, a fraudulent concealment plaintiff can be said to have advanced the same compelling and legitimate public interest as a plaintiff prosecuting an independent and valid affirmative misrepresentation claim. Both suits "discourage[] such practices in the future while encouraging a 'business climate free of fraud and deceptive practices.' " (*Robinson*, *supra*, 34 Cal.4th at p. 992, quoting *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1064.) If, however, the duty of disclosure underlying a fraudulent concealment claim cannot be shown to stand independently from the parties' contractual rights and obligations, the public policy calculus shifts considerably. (See, e.g., *Hunter*, *supra*, 6 Cal.4th at p. 1186.)

The required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) plaintiff sustained damage as a result of the concealment or suppression of the material fact. (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 606; see also CACI No. 1901.) A duty to disclose a material fact can arise if (1) it is imposed by statute; (2) the defendant is acting as plaintiff's fiduciary or is in some other confidential relationship with plaintiff that imposes a disclosure duty under the

circumstances; (3) the material facts are known or accessible only to defendant, and defendant knows those facts are not known or reasonably discoverable by plaintiff (i.e., exclusive knowledge); (4) the defendant makes representations but fails to disclose other facts that materially qualify the facts disclosed or render the disclosure misleading (i.e., partial concealment); or (5) defendant actively conceals discovery of material fact from plaintiff (i.e., active concealment). (Civ. Code, § 1710, subd. (3); *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336; see generally, 5 Witkin, Summary of Cal. Law (11th ed. 2023) Torts §§ 913–919.) Circumstances (3), (4), and (5) presuppose a preexisting relationship between the parties, such as "between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." (*LiMandri,* at p. 337.) "Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the defendant and the public at large." (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 312.)

With this framework in mind, it is not surprising that most fraudulent concealment allegations stem from precontractual negotiations (as demonstrated by three of the four *LiMandri* examples: "between seller and buyer, employer and prospective employee, . . . or parties entering into any kind of contractual agreement") and are ultimately presented as causes of action for fraudulent inducement or promissory fraud. As we observed in *Lazar*, "fraudulent inducement of contract —

as the very phrase suggests — is not a context where the 'traditional separation of tort and contract law' [citations] obtains. To the contrary, this area of the law traditionally has involved both contract and tort principles and procedures. For example, it has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud." (*Lazar*, *supra*, 12 Cal.4th at p. 645, citing *Campbell v. Birch* (1942) 19 Cal.2d 778, 791; see generally 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 726, pp. 825-826.)[12]

The same may not necessarily be true of fraudulent concealment claims based on conduct occurring after the contract has been formed. As observed in *Applied Equipment*, " 'when two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their

---

[12]  Rattagan's tort claims are, of course, based on alleged conduct committed *during* the contractual relationship but purportedly outside the parties' chosen rights and obligations. This court has granted review in two other cases — *Dhital v. Nissan North America, Inc.* (2022) 84 Cal.App.5th 828, review granted Feb. 1, 2023, S277568 and *Kia America v. Superior Court* (Feb. 3, 2022, D079858) [nonpub. opn.], review granted Apr. 20, 2022, S273170 — both of which involve claims of fraudulent inducement by concealment claims as well as the potential interplay with remedies available under the Song-Beverly Consumer Warranty Act (Civ. Code, § 1791 et seq.). We do not address these issues here.

respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.'" (*Applied Equipment*, *supra*, 7 Cal.4th at p. 517.)

In *Robinson*, the majority concluded the public policy of ensuring certainty in contract relations must give way when a party engages in affirmative misrepresentation fraud during contractual performance because "[n]o rational party would enter into a contract anticipating that they are or will be lied to." (*Robinson*, *supra*, 34 Cal.4th at p. 993.) But rational parties often do enter into a contract anticipating that there may be certain factual matters of which they wish to be made aware during the performance of a contract, and in negotiations, they often can allocate the risk of not learning that information by imposing a duty of disclosure during performance on the other party with the right to pursue particular contractual remedies in the event of breach. (See, e.g., *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1484 [parties may contract for more stringent disclosure notices than is required under regulations implementing the Truth in Savings Act (12 U.S.C. § 4301 et seq.)].) Alternatively, there may be instances in which a party obtains a contractual waiver of any obligation to disclose certain information, and such provisions are generally enforceable assuming the waiver is knowing and voluntary, and the duty itself can be lawfully waived. (Compare Fam. Code, § 1615, subd. (a)(2) [a knowing and voluntary waiver of additional financial disclosures in a premarital agreement is permitted] with Civ. Code, § 1102, subd. (c) [a waiver of a landlord's statutory disclosure obligations is void as against public policy].) As the *Robinson* majority observed, parties do not generally

enter into a contract anticipating their counterparts will *affirmatively lie* to them, or otherwise expose them to risks not reasonably anticipated and independent of losses normally occasioned by a contractual breach. They may, however, enter into a contract anticipating the other party may *withhold or conceal* certain facts during performance unless they demand an agreement not to do so. Thus, depending on a variety of circumstances, they may, and often do, find it prudent to hope for the best but plan for the worst.

When a potential injury stemming from a nondisclosure is determined to have been within the reasonable contemplation of known risks to the parties before entering into their agreement and the parties accounted for that risk, the resulting action is " ' "ex contractu" ' " or " ' "aris[ing] from a breach of a promise set forth in the contract." ' " (*Tameny*, *supra*, 27 Cal.3d at p. 175.) In such a case, public policy considerations tip away from the objective of encouraging a business climate free of fraud and toward the goal of enforcing the contractual obligations that the parties voluntarily assumed in the "mini-universe" they agree to inhabit. (*Allied Equipment*, *supra*, 7 Cal.4th at p. 517.) In other words, in such situations, a plaintiff asserting a fraudulent concealment claim in the performance of a contract generally cannot demonstrate that the defendant violated a tort duty independent of the parties' contractual rights and obligations. If, on the other hand, an independent duty to disclose certain material facts arises for a party in the course of a contractual relationship but the party intentionally conceals or suppresses such facts, inducing detrimental reliance and exposing the other party to risks of harm not reasonably contemplated when the contract was formed, the party suffering the injury may assert an " ' "ex delicto" ' " tort action for

fraudulent concealment, one " ' "aris[ing] from a breach of duty growing out of the contract." ' " (*Tameny*, *supra*, 27 Cal.3d at p. 175.)[13]

As an additional point, *Robinson* emphasized California's pleading requirement that fraud must be alleged with specificity. The requirement provides an important safeguard against the risk of tort recovery for fraud in every case involving conduct occurring during a contractual relationship. (*Robinson*, *supra*, 34 Cal.4th at p. 993.) When affirmative misrepresentation fraud is alleged, "This particularity requirement necessitates pleading *facts* which 'show how, when, where, to whom, and by what means the representations were tendered.' " (*Ibid.*; *Hills Trans. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal.App.2d 702, 707.) Uber argues that, because a fraudulent concealment claim "concerns a defendant's alleged failure to speak," the pleading standard is necessarily more relaxed, thus weakening this safeguard. Not so.

---

[13]    Suppose, for example, a seller negligently manufactures and delivers a product under warranty without being aware of a latent defect. Later, the seller learns of the defect, knows it poses a risk of serious harm beyond the parties' reasonable contemplation when they formed their warranty contract, and knows these facts are unknown or not reasonably discoverable by the buyer. If the seller fails to disclose this information or actively conceals it, the buyer may assert an independent tort for fraudulent concealment during performance against the seller, assuming all the other elements of the cause of action can be established. If, however, the defect did not cause or expose the buyer to any harm other than what was reasonably contemplated by the parties under their warranty contract, then the buyer would likely be unable to assert an independent fraud claim.

California courts apply the same specificity standard to evaluate the factual underpinnings of a fraudulent concealment claim at the pleading stage, even though the focus of inquiry shifts to the unique elements of the claim. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 347; *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248; *Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1472.) For instance, in a case such as this, the court must determine whether the plaintiff has alleged a sufficient factual basis for establishing a duty of disclosure on the part of the defendant independent of the parties' contract. If the duty allegedly arose by virtue of the parties' relationship and defendant's exclusive knowledge or access to certain facts, as Rattagan has alleged here, the complaint must also include specific allegations establishing all the required elements, including (1) the content of the omitted facts, (2) defendant's awareness of the materiality of those facts, (3) the inaccessibility of the facts to plaintiff, (4) the general point at which the omitted facts should or could have been revealed, and (5) justifiable and actual reliance, either through action or forbearance, based on the defendant's omission. "[M]ere conclusionary allegations that the omissions were intentional and for the purpose of defrauding and deceiving plaintiff[] . . . are insufficient for the foregoing purposes." (*Goodman*, at p. 347.)

Of course, it will remain for the federal courts to test the adequacy of Rattagan's complaint in light of the answer to the certified question that we provide here. In summary, the economic loss doctrine applies when the parties have entered into a contract; the plaintiff sues for tort damages, alleging defendant failed to perform as the contract requires; and negligently caused economic losses flowing from the breach. In

such a case, plaintiffs are generally limited to recovery of those economic damages and cannot seek to expand their remedies beyond those available in contract. The doctrine does not apply if defendant's breach caused physical damage or personal injury beyond the economic losses caused by the contractual breach and defendant violated a duty flowing, not from the contract, but from a separate, legally recognized tort obligation.

A case in which the plaintiff sues a contractual party for *fraud* based on conduct committed during the course of a contractual relationship falls outside the economic loss doctrine. As we explained in *Robinson*, "[d]ealing with affirmative acts of fraud and misrepresentation raises different policy concerns than those raised by negligence or strict liability claims." (*Robinson, supra*, 34 Cal.4th at p. 991, fn. 7.) California public policy strongly supports imposing a tort duty on contractual parties to refrain from fraudulent deceit and favors enforcement of valid fraud actions, which the Legislature has facilitated through the enactment of the general fraud statute. Thus, the analysis focuses on whether the plaintiff can establish the elements of the cause of action independently of the parties' contractual rights and obligations. In other words, the question will turn on the nature of the alleged conduct, the provisions of the contract itself, and whether the conduct exposed a party to a risk of harm neither reasonably contemplated nor allocated by the parties before entering their agreement. Parties generally do not enter a contract expecting that its terms will be intentionally ignored. However, to assure greater certainty between themselves, they may choose at the outset to contractually guard against certain risks by imposing specific obligations on the other party and allocate their agreed-upon remedies should a breach occur. Among other reasons, they may

choose to provide for how violations will be treated, to provide greater deterrence for some kinds of violations, or to eliminate the need to litigate regardless of whether the breach was intentional or negligent. The freedom to do so, however, is limited to agreements that do not violate public policy.

## III. CONCLUSION

Accordingly, we answer the certified question, as reframed: Under California law, a plaintiff may assert a cause of action for fraudulent concealment based on conduct occurring in the course of a contractual relationship, if the elements of the claim can be established independently of the parties' contractual rights and obligations and the tortious conduct exposes the plaintiff to a risk of harm beyond the reasonable contemplation of the parties when they entered into the contract.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Rattagan v. Uber Technologies, Inc.

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**  XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S272113
**Date Filed:** August 22, 2024

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Steyer Lowenthal Boodrookas Alvarez & Smith, Andrew A. August, Allan Steyer, Jill K. Cohoe; Greines, Martin, Stein & Richland, Cynthia E. Tobisman, Alana H. Rotter, Jeffrey E. Raskin and Laura G. Lim for Plaintiff and Appellant.

Strategic Legal Practices, Payam Shahian, Tionna Dolin and Caitlin J. Scott for Leslie Spellman as Amicus Curiae on behalf of Plaintiff and Appellant.

Knight Law Group, Roger R. Kirnos, Lauren A. Ungs and Christopher Swanson as Amicus Curiae on behalf of Plaintiff and Appellant.

Covington & Burling, Beth S. Brinkmann, Clara J. Shin, Jeffrey M. Davidson and Amy S. Heath for Defendant and Respondent.

Horvitz & Levy, Jeremy B. Rosen, Lisa Perrochet, Rebecca G. Powell and Cameron Fraser for the Chamber of Commerce of the United

States of American as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cynthia E. Tobisman
Greines, Martin, Stein & Richland LLP
6420 Wilshire Boulevard, Suite 1100
Los Angeles, CA 90048
(310) 859-7811

Jeffrey M. Davidson
Covington & Burling LLP
415 Mission Street, Suite 5400
Salesforce Tower
San Francisco, CA 94105
(415) 591-7021